**Irving H. PICARD, as Receiver for David Peter Bloom and Greater Sutton Investors Group, Inc. a/k/a Sutton Investors Group and Sutton Investment Group, Plaintiff,**

**v.**

**Judith ELBAUM and Jerome D. Elbaum, Defendants.**

**No. 88 Civ. 8023 (MBM).**

United States District Court, S.D. New York.

Feb. 27, 1989.

Elyse S. Goldweber, Joseph Lauriello, Olshan Grundman & Frome, New York City, for plaintiff.

Judith Elbaum, pro se.

Jerome D. Elbaum, pro se.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Irving H. Picard, receiver for the estate of David Peter Bloom and Greater Sutton Investors Group, Inc., filed this diversity lawsuit to recoup $39,216.47 paid to defendants Judith and Jerome Elbaum, Connecticut residents, as "profit" on a $10,000 investment placed with Bloom. As is now public knowledge, Bloom engaged in a scheme whereby funds entrusted to him for investment purposes were diverted to his personal use and expended to purchase works of art, real estate, luxury automobiles, trips, and expensive meals. Bloom also used investors' funds to repay those like the Elbaums who were fortunate enough to close out their "accounts" before Bloom's scheme was uncovered. Plaintiff was appointed receiver of Bloom's estate as part of the final injunction in a related action, *S.E.C. v. David Peter Bloom and Greater Sutton Investors Group Inc., a/k/a Sutton Investors Group and Sutton Investment Group*, 88 Civ. 0201 (MBM), and is vested by that judgment with the task of recovering Bloom's fictitious disbursements in order to reimburse defrauded investors. Plaintiff contends that the transfer of "profits" to defendants violated New York Debt & Cred.Law §§ 272, 273, 275, 276 (McKinney 1986) and common law principles of unjust enrichment and seeks to recoup that sum.

Defendants have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. For the reasons stated below, defendants' motion is denied.

■ The Court may determine a motion pursuant to Rule 12(b)(2) on the basis of the affidavits presented. *See Visual Sciences, Inc. v. Integrated Communications Inc.*, 660 F.2d 56, 58 (2d Cir.1981); *Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). In order to prevail, plaintiff need only make out a *prima facie* case of jurisdiction, *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981), with all inferences in its favor. *Nee v. HHM Financial Servs., Inc.*, 661 F.Supp. 1180, 1181 (S.D.N.Y.1987) (Pollack, J.); *Interface Biomedical Laboratories v. Axiom Medical, Inc.*, 600 F.Supp. 731, 735 (E.D.N.Y. 1985). *See also Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

■ In an action based on diversity of citizenship, the law of the state in which the action is begun determines whether the federal court has personal jurisdiction. *Arrowsmith v. United Press Int'l*, 320 F.2d 219 (2d Cir.1963). Plaintiff relies on N.Y. Civ.Prac.L. & Rules § 302(a)(1) (CPLR) to assert jurisdiction here. CPLR § 302(a)(1) establishes jurisdiction as to a cause of action arising from the acts of a non-domiciliary defendant who in person or through an agent "... transacts any business within the state." The fact that the non-domiciliary was never physically present in New York is not controlling. *Dero Enters., Inc. v. Georgia Girl Fashions, Inc.*, 598 F.Supp. 318, 321 (S.D.N.Y.1984). Rather, the proper focus is whether the totality of circumstances, *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986), demonstrates that the defendants " 'purposefully avail[ed themselves] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.' " *McKee Electric Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377,

382, 283 N.Y.S.2d 34, 38, 229 N.E.2d 604, 607 (1967) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)); *see also Mayes v. Leipziger,* 674 F.2d 178, 183 (2d Cir.1982).

With those principles in mind, I turn to defendants' contacts with the New York forum. It is undisputed that this lawsuit arises out of defendants' contacts with New York; what is contested is the extent of those contacts. Plaintiff alleges that, in or about December 1985, Mrs. Elbaum, a Connecticut resident, sent a check for $10,-000 to Bloom in New York for the express purpose of purchasing a 10% interest in a thoroughbred horse named "Lightswitch." (Picard Aff. at ¶ 8(a); Judith Elbaum Aff. at ¶ 9) Unbeknownst to the Elbaums, no such investment was ever made. (Picard Aff. at ¶ 8(b)). In or about October, 1986, Bloom contacted Mrs. Elbaum and advised her that he had sold the horse for $8000, but retained an interest in two unnamed colts. He offered to open an investment account in New York in her name to invest in securities on stock exchanges located in New York, or in the over-the-counter market. Mrs. Elbaum agreed to the arrangement. Again, unbeknownst to the Elbaums, no such account was ever opened. (Picard Aff. at ¶ 8(c)) At the end of 1986, Bloom sent Mrs. Elbaum a fictitious account statement showing that he had bought ten Apple Computer Co. "calls" in her name.

On April 5, 1987, Mrs. Elbaum "wrote a letter to Mr. Bloom explaining that I wanted to liquidate my investment." (Judith Elbaum Aff. at ¶ 9) Soon after, Bloom told the Elbaums he had complied with their wishes and sold the calls for $35,216.47. On April 10, 1987, Jerome Elbaum wrote Bloom stating that he would arrange for either his wife's father or his son Steven to pick up the check in New York. (Picard Aff., Exh. D) On April 13, 1987, at his parents' direction, Steven Elbaum picked up the check representing the fictitious profit. (Jerome Elbaum Aff. at ¶ 9; Judith Elbaum Aff. at 10; Picard Aff. at ¶ 8(f)) Bloom included a cover letter listing a New York office address with the check. Thereafter, Bloom allegedly sold the two un-named colts and arranged on November 17, 1987 to have an additional $14,000 wired from a Sutton Investment Group account at a New York bank to Mr. Elbaum's account at a Connecticut bank. (Picard Aff. at ¶ 9)

During the course of their two-year relationship with Bloom, the Elbaums never had a face-to-face meeting with Bloom in New York. However, Mr. Elbaum met Bloom once in Stamford, Connecticut, in March 1987. (Jerome Elbaum Aff. at ¶ 6) Otherwise, their contact was limited to telephone calls and letters. Specifically, although Mrs. Elbaum admits to "several telephone conversations with Mr. Bloom concerning the status of my investment," she contends that "all of the telephone conversations were calls made by Mr. Bloom to me in the State of Connecticut." (Judith Elbaum Aff. at ¶ 8) For his part, Mr. Elbaum, whom Mrs. Elbaum maintains made "most of the inquiries concerning the investment" (*Id.*), "wrote ... five letters to Mr. Bloom in New York, inquiring about the status of my wife's investment through Mr. Bloom." (Jerome Elbaum Aff. at ¶ 7) He also had a "few" telephone conversations with Bloom in New York, but the "majority" of those calls were initiated by Bloom. (*Id.*)

Although each defendant attempts to differentiate his or her activity from the other, I find that, even relying only on their own affidavits, they were acting as agents for one another such that, if personal jurisdiction is valid against one, it will be valid against the other. Indeed, for all practical purposes, the Elbaums were acting at all times as an unitary economic unit.

■ Although placing an order by telephone from outside New York, without more, does not constitute transaction of business by a defendant, *see Beacon Enters. v. Menzies,* 715 F.2d 757, 766 (2d Cir.1983), *Dero Enters.,* 598 F.Supp. at 321 (collecting cases), *Dogan v. Harbert Construction Corp.,* 507 F.Supp. 254, 261 (S.D. N.Y.1980), New York state courts have crafted several limited exceptions where "significant alternative" factors are

present. *Metropolitan Air Serv., Inc. v. Penberthy Aircraft Leasing Co.,* 648 F.Supp. 1153, 1156 (1986). One famous exception concerns a non-domiciliary who actively participated in an auction in New York by a telephone hook-up. *Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 18, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 508 (1970). Even though only one transaction was involved, the court found jurisdiction proper because the "defendant, in a very real sense, projected himself into the auction room." *Id.*

■ More apropos the case at hand, New York courts have also found jurisdiction where a defendant engages in continuous activity such that, although he remains physically outside the state, his actions impact heavily on the forum. This exception is invoked most often when a non-domiciliary maintains an ongoing investment account in New York and especially when he directs the sale of securities in New York. In such circumstances, any additional contact with the forum—even one which standing alone would not be enough—suffices to invoke New York's long-arm statute. In *Ehrlich–Bober & Co. v. Univ. of Houston,* 49 N.Y.2d 574, 427 N.Y.S.2d 604, 404 N.E.2d 726 (1980), the New York Court of Appeals affirmed the assertion of jurisdiction over a non-domiciliary who, during a six month period, had engaged in 22 "reverse repurchase" transactions in which securities were sold through a New York securities dealer and then later repurchased on a specified date. All contacts were by phone and mail; on one occasion, however, defendant's agent travelled to New York and purchased securities from plaintiff. Even though this one contact would probably not suffice to assert jurisdiction if the transaction were a one-shot deal, *see, e.g., McKee Electric Co.,* 20 N.Y.2d 377, 283 N.Y.S.2d at 38, 229 N.E.2d at 609 (no jurisdiction where the parties communicated only by mail and defendant's agents met with plaintiff once for two hours in New York to discuss matters related to the contract), it was sufficient to find that defendant there was transacting business within New York because of the continuous nature of defendant's contacts with the forum. *See May-*

*es,* 674 F.2d at 184 ("[I]n *Ehrlich–Bober,* as in *Parke–Bernet Galleries,* the defendant had projected itself by means of letters and calls into market activity that was ongoing in New York, and hence had purposely availed itself of the privilege of conducting such activities within the state.")

The court also found important the fact that the non-domiciliary in *Ehrlich–Bober* ordered the sale of securities within New York. *See Ehrlich–Bober & Co. v. University of Houston,* 69 A.D.2d 75, 78, 418 N.Y.S.2d 81, 83 (1st Dep't 1979) (opinion of Kupferman, J., dissenting on other grounds) ("Specifically involved are certain securities held by the University and transmitted to the plaintiff in New York for *sale....* There clearly was jurisdiction here. The University ... sent its agreements here and its *securities here.*") (emphasis added) Indeed, the New York legislature amended § 302(a)(1) in 1979 expressly to provide for jurisdiction over a defendant who contracts to supply goods or services in this state. Thus, as Judge Leisure has noted in commenting on the sale aspect of *Ehrlich–Bober,* "courts have traditionally been more willing to find jurisdiction over a defendant who supplies goods or services to the New York market." *Technology Prods. Int'l, Inc. v. Integrated Electronics Inc.,* 85 Civ. 2111 (PKL), slip op. at 5 n. 2 (S.D.N.Y. February 19, 1986) [1986 WL 2413].

In another case where the exception was invoked, *L.F. Rothschild, Unterberg, Towbin v. Thompson,* 78 A.D.2d 795, 433 N.Y.S.2d 6 (1st Dep't 1980), the court sustained jurisdiction over an Alabama resident who maintained an account with a New York stockbroker but transacted business only by telephone and mail. In finding jurisdiction, the court noted that he had engaged in 25 transactions over four months and his option agreement provided that New York law would apply. Although the one-page memorandum decision does not set forth the precise facts in the case, it is obvious that some of the transactions involved sales of securities. Of course, the fact that the "option agreement" provided that New York law would apply was also significant.

Another First Department opinion involving the same plaintiff shows the limits of this exception. In *L.F. Rothschild, Unterberg, Towbin v. McTamney*, 89 A.D.2d 540, 541, 452 N.Y.S.2d 630, 631 (1st Dep't 1982), *aff'd mem.*, 59 N.Y.2d 651, 449 N.E.2d 1275, 463 N.Y.S.2d 197 (1983), defendant was a Pennsylvania resident whose only relevant contacts with New York were several telephone conversations with his New York stock broker during which he made one *purchase* of stock. Significantly, the majority held that defendant had "no direct or personal involvement in any on-going *sale* in New York." *McTamney*, 452 N.Y.S.2d at 631 (emphasis added). Emphasizing the distinction between a one-shot transaction and the maintenance of an ongoing investment account where sales as well as purchases were made, the dissenters noted that, if the lawsuit had concerned defendant's earlier long-term account with another New York stock broker, there could be "little doubt" that the assertion of personal jurisdiction would be justified. *Id.* at 632.

I find that this case falls within the exception carved out by *Ehrlich–Bober*, *Thompson* and *McTamney*. First, defendants' activities were continuous and systematic. For two years, defendants engaged in at least three transactions—receipt on separate occasions of proceeds from what they thought was the sale of the horse, the sale of the calls, and the sale of the colts—and maintained an ongoing investment account with Bloom's investment service in New York. Although the total number and volume of transactions do not reach the level of *Ehrlich–Bober* and *Thompson*, the period of time—two years—is far greater than was involved in either of those cases. In any event, three transactions and the maintenance of an investment account in New York can by no means be compared to the one-shot transaction deemed insufficient in *McTamney*. Rather, the Elbaums' affidavits, even taking into account their protestations that their investment was a "passive" one, demonstrate that their investments were purposeful and continuous. Mr. Elbaum concedes he wrote *five letters* to Bloom over a

two year period about his wife's investments. Such ongoing monitoring is not the stuff of a one-shot deal, nor does it indicate a situation where the New York broker initiates all the contacts as in *Glassman v. Hyder*, 23 N.Y.2d 354, 296 N.Y.S.2d 783, 244 N.E.2d 259 (1968).

Second and equally important, Mrs. Elbaum admits that she ordered the sale of ten Apple Computer calls in the state of New York, and that Bloom was instructed to act as an agent in completing the transaction. (Judith Elbaum Aff. at ¶ 9); *see Sterling Television Presentations, Inc. v. Shintron Co., Inc.*, 454 F.Supp. 183, 186–87 (S.D.N.Y. 1978) (attempted sale of one product by foreign defendant in New York significant in finding jurisdiction). Moreover, even accepting defendants' contention that they knew nothing about the sale of the three horses, defendants certainly did not try to stop Bloom or withdraw their funds when they learned of these sales. Indeed, defendants arranged to wire transfer the proceeds of the sale of the two unnamed colts to their Connecticut bank. At a minimum, by their own account of the events, they ratified the three sales by accepting the benefits of the transactions. Defendants also note that the first horse was in Kentucky and thus had no connection with the New York forum. Even if this is true, as far as defendants knew, Bloom was, at all times, at his New York office, giving them a strong indication that at least some of the negotiations would be conducted in New York.

Third, defendants admit that they directed their son to enter this forum and pick up the check constituting their profits on the sale of the calls. This entry is similar to *Ehrlich–Bober* where the defendant sent an agent to New York to place one order. The court found this otherwise insignificant contact important because it revealed that the defendant was *purposefully* reaping the benefits of New York markets. *See Mayes*, 674 F.2d at 184.

Finally, defendants benefitted substantially from Bloom's self-admitted fraudulent activities in New York, conduct which has injured many New York residents.

Even though there is no allegation that defendants knew of Bloom's scheme, they benefitted from his tortious activities here. In such a situation, New York has a strong interest in recouping sums fraudulently taken from its residents. *Cf. Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 24 (2d Cir.1988) (noting New York's strong interest in providing forum for defrauded residents in determining constitutionality of asserting long-arm jurisdiction over non-resident corporate officers who benefitted by corporation's in-state fraudulent activities).

Although any one of these factors might not be sufficient, together they constitute powerful evidence that defendants "purposefully availed [themselves] of the privilege of conducting activities within [New York]." *McKee Electric Co.,* 283 N.Y.S.2d at 38, 229 N.E.2d at 609. I am convinced that, were a New York state court confronted with the same facts, it would assert jurisdiction over defendants here. *Cf. China Union Lines, Ltd. v. American Marine Underwriters, Inc.,* 454 F.Supp. 198 (S.D.N.Y.1978) (New York long-arm jurisdiction invoked where Canadian insurer who never entered New York agreed with New York insurance broker to insure a Chinese corporation and consented to send all payments on losses to New York for forwarding to insured).

That the activities the Elbaums believed they were directing were not in fact happening does not change the calculus for finding jurisdiction. The inquiry into whether jurisdiction is proper focuses on the intent of the non-domiciliaries, as reflected by their actions. *See McKee Electric Co.,* 283 N.Y.S.2d at 38, 229 N.E.2d at 609 (inquiry is whether defendants *"purposefully"* availed themselves of the privilege of conducting business in New York) (emphasis added). Moreover, defendants cannot benefit from the fraud Bloom committed in not buying and selling the investments when, in fact, they materially benefitted from his illegal scheme.

As New York's long-arm statute is not intended to confer the maximum exercise of *in personam* jurisdiction which the Constitution would permit, *see United States v. Montreal Trust Co.,* 358 F.2d 239, 242 (2d Cir.), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966); *Columbia Pictures Industries, Inc. v. Schneider,* 435 F.Supp. 742, 749 (S.D.N.Y.1977), *aff'd without opinion,* 573 F.2d 1288 (2d Cir.1978); *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), the question whether the assertion of jurisdiction would satisfy due process is a comparatively easy one. As plaintiff's claim here "is related to or 'arises out of' a defendant's contacts with the forum, ... a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of *in personam* jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)). By investing with Bloom in New York over a two-year period, maintaining an investment account in New York for that same period of time, and ordering at least one sale in New York, defendants purposely and systematically sought the benefits of engaging in business in this forum. Therefore, they had " 'fair warning that a particular activity may subject [them] to the jurisdiction of the foreign sovereign.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (quoting *Shaffer,* 433 U.S. at 218, 97 S.Ct. at 2587 (Stevens, J., concurring)), and thus the assertion of jurisdiction here accords with due process.

Accordingly, defendants' motions are denied.

SO ORDERED.