NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2013-348


NEW HAMPSHIRE BANK COMMISSIONER, AS LIQUIDATOR FOR NOBLE TRUST COMPANY & a.

v.

CECIL SWEENEY & a.

Argued: March 6, 2014
Opinion Issued: October 24, 2014


Ann M. Rice, deputy attorney general (Peter C.L. Roth, senior assistant attorney general, on the brief and orally), and Sheehan Phinney Bass + Green PA, of Manchester (Christopher M. Candon on the brief), for the petitioner.

Cleveland, Waters and Bass, P.A., of Concord (William B. Pribis on the brief), and Law Offices of Robert A. Stolzberg, of Boston, Massachusetts (Robert A. Stolzberg on the brief and orally), for respondents John Sinanis and Stylianos Sinanis.

CullenCollimore, PLLC, of Nashua (Brian J.S. Cullen on the brief and orally), for respondents Ivan Green, Mary Green, Susan Kelly (f/k/a Susan Fry

Hare), Frank Arnone, Charles Carlson, Webster Dean, Tom Langel, DeeAnn Langel, Ardith Neustaeder, Darwin Schweitzer, Sharon Schweitzer, and Sharp Enterprises.

LYNN, J. The respondents, fourteen non-residents[1] named in a petition filed by the New Hampshire Bank Commissioner, as liquidator for Noble Trust Company (Noble) and Aegean Scotia Holdings, LLC (Aegean Scotia), appeal an order of the Superior Court (Smukler, J.) denying their motions to dismiss for lack of personal jurisdiction. We affirm and remand.

I

The following facts, which are common to each respondent, were found by the trial court or are supported by the record and uncontested. Noble was a non-depository banking institution that, at all times, conducted business in Manchester. The respondents are residents of Michigan, Montana, Missouri, Idaho, Texas, Florida, Oregon, and Kansas. Each respondent, or an agent of each respondent, signed an Individual Investment Management Account Form and Administration Agreement (agreement) with Noble. Each agreement bears Noble's name and New Hampshire business address and specifies that it will be governed, interpreted, and enforced under New Hampshire law. Each agreement required the signatories to attest that they had thoroughly read it and agreed to its terms and conditions. The agreements instructed the respondents to send their completed applications to Noble in New Hampshire, and specified that the respondents could either send a check to Noble in New Hampshire or wire funds to an account in Colorado. If the respondents had inquiries about their accounts, they were directed to contact Noble's president at a New Hampshire telephone number. Periodic account statements, which identified Noble as the account manager and named Aegean Scotia, another New Hampshire entity, as Noble's parent company, were sent to the respondents.

In addition to these common facts, the trial court found or the record supports the following facts specific to individual respondents. John and Stylianos Sinanis agreed to send their investment money by check to Noble in New Hampshire. Their nephew was an original owner of Noble and they communicated with Noble through him. Susan Kelly and her husband Brian corresponded with Noble on several occasions, first to add Brian to the account, and then to liquidate it. Frank Arnone or his agent called Noble twice in New Hampshire with account inquiries. Arnone also solicited Noble to serve as Noble's realtor. Ardith Neustaedter or her agent contacted Noble in New

---

[1] The respondents are John Sinanis, Stylianos Sinanis, Ivan Green, Mary Green, Susan Kelly, Frank Arnone, Charles Carlson, Webster Dean, Tom Langel, DeeAnn Langel, Ardith Neustaedter, Darwin Schweitzer, Sharon Schweitzer, and Sharp Enterprises.

2

Hampshire to make account inquiries and terminate her account. Ivan and Mary Green or their agent contacted Noble in New Hampshire to purchase insurance, make account inquiries, and terminate their account. Tom and DeeAnn Langel faxed their agreement to Noble in New Hampshire and engaged in e-mail correspondence with Noble. Webster Dean engaged in e-mail correspondence with Noble, and his initial investment check bore Noble's New Hampshire address. Sharp Enterprises, through its agent, corresponded several times with Noble to transfer and eventually close all Sharp accounts. Charles Carlson corresponded with Noble to withdraw money. Darwin and Sharon Schweitzer called Noble to withdraw money, wire funds to another account, and renew their account.

The petition alleges that Noble was involved in a "Ponzi scheme," in which Noble used new investors' money to cover the losses of earlier investors. It seeks to set aside transfers of money from Noble to the respondents, impose constructive trusts, and recover for unjust enrichment and conversion. The respondents moved to dismiss the suit for lack of personal jurisdiction. The trial court denied the motion, finding that the court could exercise personal jurisdiction over the respondents on the basis that (1) Carlson and the Schweitzers filed proofs of claim in the liquidation proceeding against Noble in New Hampshire and (2) the remaining respondents had sufficient minimum contacts with New Hampshire. This appeal followed.

II

Our standard of review for rulings on motions to dismiss for lack of personal jurisdiction varies according to the case's procedural posture. Kimball Union Academy v. Genovesi, 165 N.H. 132, 136 (2013). "When, as in this case, the trial court rules upon the motion without holding an evidentiary hearing, the trial court employs a prima facie standard, and we review the trial court's decision de novo." Id. (quotation omitted). Under the prima facie standard, the inquiry is whether the petitioner has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction. Id. The petitioner ordinarily cannot rest upon the pleadings, but must adduce evidence of specific facts. Id. "Both the trial court and we, when undertaking de novo review, must accept the [petitioner]'s (properly documented) proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Id. (quotation omitted). "The [petitioner's] evidentiary proffers must be construed in the light most congenial to the petitioner's jurisdictional claim, and facts put forward by a respondent may be considered only if they are uncontradicted by the petitioner's submissions." Id.

Determining whether a court may exercise personal jurisdiction over a respondent contemplates a two-part analysis. Staffing Network v. Pietropaolo, 145 N.H. 456, 457 (2000). "First, the State's long-arm statute must authorize

3

such jurisdiction. Second, the requirements of the federal Due Process Clause must be satisfied." Id. However, because New Hampshire's long-arm statute authorizes the exercise of personal jurisdiction over a non-resident "to the extent permissible under the Federal Due Process Clause," Hemenway v. Hemenway, 159 N.H. 680, 685 (2010) (quotation omitted), the due process analysis is normally dispositive of the matter. See Metcalf v. Lawson, 148 N.H. 35, 37 (2002) (stating that, in determining whether a New Hampshire court may exercise personal jurisdiction over a non-resident defendant, "our primary analysis relates to due process").

III

Our long-arm statute, RSA 510:4, I (2010), provides, in pertinent part:

> Any person who is not an inhabitant of this state and who, in person or through an agent, transacts any business within this state . . . submits himself . . . to the jurisdiction of the courts of this state as to any cause of action arising from or growing out of the acts enumerated above.

Here, the respondents transacted business within the meaning of the long-arm statute because each opened an account with, and later withdrew money from, Noble, a New Hampshire entity. Leeper v. Leeper, 114 N.H. 294, 297 (1974) (holding that contacting and withdrawing assets from New Hampshire banks "falls within the ambit of the phrase 'transacts any business'" in RSA 510:4, I). In addition, as explained in more detail below, the claims brought by the petitioner all arise from or grow out of the accounts that the respondents maintained with Noble in New Hampshire.

Under the Federal Due Process Clause, a court may exercise personal jurisdiction over a non-resident respondent if the respondent has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Kimball Union Academy, 165 N.H. at 138. Personal jurisdiction can be "general," if the respondent's contacts with the forum state are "continuous and systematic," or "specific," if "the cause of action arises out of or relates to the [respondent]'s forum-based contacts." Staffing Network, 145 N.H. at 458 (quotations omitted). Here, the petitioner asserts only that the court may exercise specific personal jurisdiction.

In determining whether the exercise of specific personal jurisdiction over the respondents comports with due process, we examine whether: (1) the contacts relate to the cause of action; (2) the respondents have purposefully availed themselves of the protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the respondents to defend the suit in New Hampshire. Id. Each factor must be evaluated on a case-by-case basis, and

4

all three factors must be satisfied for the exercise of jurisdiction to be constitutional.  Id.  The determination of whether minimum contacts exist "is one in which few answers will be written in black and white.  The greys are dominant and even among them the shades are innumerable."  Phelps v. Kingston, 130 N.H. 166, 171 (1987) (quotation omitted).

First, the cause or causes of action must arise out of, or relate to, the respondents' contacts with New Hampshire.  Staffing Network, 145 N.H. at 458.  In addition, a finding of jurisdiction is more likely if there are "plus" factors in addition to the mere existence of a contract with a New Hampshire entity.  Id. at 458.  "Plus" factors include, but are not limited to:  (1) the forum state being the location to which payments under the contract were to be sent; (2) a choice of law provision in the contract selects the forum state's laws as governing the transaction; and (3) the use of the petitioner's form documents bearing its address in the forum state.  Id.  Although not conclusive, a choice of law provision militates in favor of finding jurisdiction in the state whose laws govern the contract.  Id. at 459.

Here, the respondents' contacts with New Hampshire relate to the causes of action.  The respondents entered into an agreement and invested money with Noble, a New Hampshire entity.  Noble later sent payments, from New Hampshire, to the respondents.  The causes of action, to set aside fraudulent transfers, impose constructive trusts, and recover for unjust enrichment and conversion, seek the return of those same payments from the respondents.  Also "plus" factors are present – the agreement with Noble, which all the respondents signed, included a choice of law provision specifying that it would be interpreted and enforced under New Hampshire law, and the agreement bore Noble's address in New Hampshire.

Second, the respondents must have purposely availed themselves of the protections of New Hampshire law.  Staffing Network, 145 N.H. at 458-59.  Purposeful availment requires both foreseeability and voluntariness.  Kimball Union Academy, 165 N.H. at 140.  Voluntariness requires that a respondent's contacts with the forum state proximately result from actions by the respondent.  Id.  The contacts must be deliberate and not based on the unilateral actions of another party.  Id.  Foreseeability requires that the contacts must be of a nature such that a respondent could reasonably anticipate being haled into court here.  Id.  The contacts cannot be merely fortuitous, but rather, the respondents must have purposefully directed actions at New Hampshire.  Brother Records v. HarperCollins Publishers, 141 N.H. 322, 325 (1996).

The respondents purposely placed money with Noble, a non-depository banking institution, in New Hampshire.  The respondents claim that they did not know that Noble was a New Hampshire entity, and, therefore, they did not purposefully direct any activity at New Hampshire.  These claims are at odds

with the evidence adduced by the petitioner. Each respondent signed an agreement with Noble that included Noble's New Hampshire address, a New Hampshire choice of law provision, contact information for Noble in New Hampshire, instructions to send the agreement to New Hampshire, and the option to send a check to New Hampshire. Further, the agreements stated that by signing, the respondents had read and agreed to the terms and conditions in the agreement. Assertions by the respondents that contradict these submissions by the petitioner are insufficient to defeat personal jurisdiction under the prima facie standard. See Kimball Union Academy, 165 N.H. at 136. Simply put, it is implausible that the respondents did not know that they were investing with a New Hampshire entity.

By signing the agreement, sending the agreement and money to Noble in New Hampshire, and contacting Noble in New Hampshire, the respondents engaged in voluntary actions such that the contacts cannot be said to be based on the unilateral activity of Noble. The respondents' contacts with New Hampshire were not fortuitous. Lyme Timber Co. v. DSF Investors, 150 N.H. 557, 562 (2004) ("Given that Lyme is based in New Hampshire and that [defendant]'s communications were directed to Lyme here, the alleged impact cannot be said to be fortuitous."). By voluntarily entering into such agreements with a New Hampshire entity, the respondents could reasonably have anticipated being haled into court here. Computac, Inc. v. Dixie News Co., 124 N.H. 350, 354 (1983); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 464, 479-82 (1987) (finding it reasonably foreseeable that the defendant, a Michigan resident, would be haled into court in Florida when he purposely entered into an agreement with what he knew to be a Florida enterprise, and the agreement contained a Florida choice of law provision). Whether the respondents actually expected to be haled into court does not determine whether jurisdiction was reasonably foreseeable. See J. McIntyre Machinery, Ltd. v. Nicastro, 131 S. Ct. 2780, 2789 (2011) ("[I]t is the [respondent]'s actions, not his expectations, that empower a State's courts to subject him to judgment.").

The respondents argue that they were merely passive investors in Noble and that their actions do not meet the purposeful availment requirement. Noting that this court has not previously addressed the issue of personal jurisdiction over so-called passive investors, the respondents rely upon cases from other jurisdictions. See, e.g., Sender v. Powell, 902 P.2d 947, 951-52 (Colo. App. 1995) (holding that Colorado lacked personal jurisdiction over defendant, a California resident, who invested in a Colorado business as a limited partner and had no control over the enterprise); Tejal Vyas, LLC v. Carriage Park, L.P., 600 S.E.2d 881, 888 (N.C. Ct. App. 2004) (finding that North Carolina lacked personal jurisdiction over Illinois defendants whose only connection to the forum state was that they entered into a contract with North Carolina plaintiffs whereby plaintiffs invested in an Illinois real estate venture), aff'd, 608 S.E.2d 751 (N.C. 2005); Klein v. Mega Trading Ltd., 416 So. 2d 866,

866 (Fla. Dist. Ct. App. 1982) (finding that Florida had no personal jurisdiction over a New Jersey defendant whose only contact with Florida was that he purchased an interest in a Florida limited partnership).

We recognize that these cases offer some support for the respondents' position. However, we disagree with the Powell court's conclusion that an action seeking to recover allegedly excessive distributions made to an early investor in a forum state Ponzi scheme does not arise out of the investor's investment in that venture. See Powell, 902 P.2d at 952. We also find Tejal Vyas distinguishable because it involved essentially the reverse of the situation presented here – in that case it was a North Carolina investor who sought to subject Illinois defendants to jurisdiction in North Carolina even though the real estate venture at issue was in Illinois, the agreement required performance in Illinois, and the agreement was governed by Illinois law. See Tejal Vyas, 600 S.E.2d at 888. In this case, by contrast, New Hampshire unquestionably is the jurisdiction that was the hub of the activities out of which the respondents' alleged liability arises.

More persuasive, in our view, are cases such as Finn v. Walworth State Bank, Nos. A11-2334, A11-2344, A12-0250, A12-2246, 2013 WL 6389521 (Minn. Ct. App. Dec. 9, 2013), review denied (Minn. Feb. 18, 2014). In Finn, the court found that several banks had sufficient minimum contacts with Minnesota when their only contact with Minnesota was their purchase of loan participations from a Minnesota entity. Finn, 2013 WL 6389521, at *1. The entity, First United, engaged in a Ponzi scheme and the banks that invested early were able to recover their investments and make profits. Id. The receiver for First United brought clawback claims against the banks. Id. The banks had entered into one or more participation agreements with First United. Id. at *10. Many of the agreements included a Minnesota choice of law provision. Id. at *13. The banks transferred money to First United or to a third party and received payment from First United. Id. at *11. The court noted that many of the banks did not solicit the transaction, and no one from the banks traveled to Minnesota. Id. at *13.

The court in Finn found that the agreements provided for performance in Minnesota and indicated an on-going relationship between First United and the banks, which distinguished the case from several that involved one isolated transaction between parties. Id. at *11. The court drew support for its ruling from the fact that the activities provided for in the agreements were actually performed by First United on behalf of the banks. Id. at *12. Even though the banks disputed that First United was their agent because they did not actually exercise control over First United, the court held that the banks' right of control, not the use of it, determined whether the banks had control over First United. Id. The court also relied upon the choice of law provisions included in the agreements signed by the banks. Id. at *13; see also Wessels, Arnold & Henderson v. Nat. Medical Waste, 65 F.3d 1427, 1434 (8th Cir. 1995) ("The

7

choice of law clause . . . is insufficient standing alone to confer jurisdiction. However, when these contacts are combined with the other factors, they become wholly relevant and significant."). Like the banks in Finn, the respondents here signed form agreements, which included a New Hampshire choice of law provision, named Noble as their agent, and indicated an on-going relationship. Like the defendants in Finn, they sent money to New Hampshire and received payments from New Hampshire.

We also find the decisions in Newbro v. Freed, 337 F. Supp. 2d 428 (S.D.N.Y. 2004), and Picard v. Elbaum, 707 F. Supp. 144 (S.D.N.Y. 1989), to be instructive. In Newbro, the defendants invested with a New York entity that was running a Ponzi scheme. Newbro, 337 F. Supp. 2d at 430. The court found that the defendants had sufficient minimum contacts with New York because they maintained an investment account with a New York entity for two years, during which time they had several communications with the account manager in New York, both in person and by letter and telephone. Id. at 434. The defendants voluntarily gave the New York entity the authority to act as their broker, and at their direction, it wired money on their behalf and made payments to them. Id.

In Picard, the defendants were Connecticut residents and investors who closed their accounts before their New York broker's fraudulent scheme was discovered. Picard, 707 F. Supp. at 145. Suit was brought against them to recoup payments made to them in order to reimburse other investors who allegedly had been defrauded. Id. The court held that New York could exercise jurisdiction over the defendants because they opened an investment account in New York, maintained the account for two years, and ordered at least one transaction from the account. Id. at 149.

The respondents in this case, like the defendants in Newbro and Picard, maintained an investment account for a prolonged period of time,[2] engaged in multiple communications with the entity that held the account, and had some authority to direct account activities, such as withdrawing some or all of the funds or having funds wired into another account. See also Fidelity State Bank, Garden City, Kan. v. Oles, 130 B.R. 578, 585 (Bankr. D. Kan. 1991) (finding minimum contacts because the defendant entered into a relationship with, and made deposits to and withdrawals from, a bank that he knew was in the forum state). Consistent with Finn, Newbro, and Picard, we find the respondents' forum-related contacts sufficient to establish that they purposely availed themselves of the protection of New Hampshire law.

The third federal due process requirement is that it must be fair and reasonable to require the respondents to defend the suit in New Hampshire.

_____

[2] The record before the court reflects that the various respondents maintained accounts with Noble for periods ranging from approximately six months to eighteen months.

Kimball Union Academy, 165 N.H. at 138. For this determination, we examine the five "so-called 'gestalt factors,'" which consider: the burden on the respondent; the forum state's interest in adjudicating the dispute; the petitioner's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies. Vt. Wholesale Bldg. Prods. v. J.W. Jones Lumber Co., 154 N.H. 625, 629 (2006). These factors sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. Id.

Here, a burden on the respondents exists, as is always the case with non-resident respondents. However, we find that this burden is outweighed by the other factors at play.[3] New Hampshire has a great interest in adjudicating this matter because the State has a substantial interest in the integrity and economic stability of banks located in this state. See Leeper, 114 N.H. at 297. New Hampshire also has an interest in seeing that the liquidation of Noble, a New Hampshire entity, proceeds expeditiously. The respondents reside in different states, which could require parallel lawsuits in eight different forums if the litigation could not be consolidated in this state. The superior court's ability to act as the sole forum for resolving the matters in dispute between the petitioner and all of the respondents greatly increases the speed and efficiency of the liquidation, which will benefit the petitioner as well as the interests of the interstate judicial system. The respondents argue that it is not fair to require them to defend this suit in New Hampshire because they did not engage in any wrongdoing. This assertion, however, goes to the merits of the litigation and does not factor into the determination of whether this state may exercise personal jurisdiction over the respondents. See Newbro, 337 F. Supp. 2d at 432 n.1. In sum, we find that it is fair and reasonable to require the respondents to defend this suit in New Hampshire.

Finally, the respondents argue that Noble was not their agent and that a theory of agency cannot be used to confer personal jurisdiction over them. As we find sufficient minimum contacts with New Hampshire based on acts of the respondents themselves, we need not consider this argument.

Carlson and the Schweitzers argue that the trial court erred by relying upon their proofs of claim filed in the liquidation proceeding to justify the exercise of personal jurisdiction over them. They contend that their claims were separate from the petitioner's action, and as such, cannot be used to

---

[3] It is apropos here to observe that, upon remand, the trial court has broad authority to implement measures that may help to alleviate the burden on the respondents of defending the litigation in this forum. For instance, in the exercise of its sound discretion, the court may require that depositions be taken where the respondents live, or allow the respondents to participate in depositions remotely.

9

support the exercise of personal jurisdiction.  Assuming, without deciding, that the trial court erred by relying upon the proofs of claim, we conclude that, for all of the reasons discussed above, Carlson and the Schweitzers had sufficient minimum contacts with New Hampshire to justify the exercise of personal jurisdiction over them.

IV

For the reasons stated above, we hold that this state's long-arm statute and federal due process requirements permit New Hampshire courts to exercise personal jurisdiction over all of the respondents in this case.

Affirmed and remanded.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred.