NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————

Grafton
No. 2020-0259

CHRISTINE SEWARD

v.

CHARLES RICHARDS & a.

Argued: May 27, 2021
Opinion Issued: September 8, 2021

Law Office of David N. Cole, of Lyme (David N. Cole on the brief) and Myers Associates, PLLC, of Lebanon (Howard B. Myers on the brief and orally), for the plaintiff.

Hughes Atwood & Mullaly, PLLC, of Lebanon (John R. Hughes, III on the brief) and Buckley & Zopf, of Claremont (Melvin T. Diep orally), for the defendants.

HICKS, J. Three defendants, Charles Richards, Chairman's View, Inc. (Chairman's View), and CoreValue Holdings, LLC (CoreValue), appeal an order of the Superior Court (MacLeod, J.) denying their motion to dismiss, for lack of personal jurisdiction, this action brought by the plaintiff, Christine Seward. Two additional defendants, Consulting Software System, LLC (CSS) and George Sandmann, were not parties to the motion to dismiss and are not parties to this appeal. We affirm.

The plaintiff brought the instant action against Richards, Chairman's View, CoreValue (collectively, for purposes of this opinion, "the defendants"), CSS, and Sandmann for claims related to the transfer of a patent. The plaintiff's complaint alleges the following jurisdictional facts. The plaintiff resides in Hanover. Chairman's View is a Delaware corporation that is registered with the New Hampshire Secretary of State to do business in New Hampshire as a foreign corporation. Its principal office is located in White River Junction, Vermont. CoreValue is a Nevada limited liability company that is registered to do business in Vermont and has the same principal office address in White River Junction as Chairman's View. Richards resides in Norwich, Vermont, and is the president, sole director, and majority shareholder of Chairman's View and is the managing member, and either the sole or majority member, of CoreValue.

The complaint further alleges the following. Chairman's View develops software for business and commercial applications. In 2016, when Chairman's View applied for a certificate of authority to do business in New Hampshire, it maintained a physical address in Lebanon, New Hampshire. The plaintiff is a former employee of Chairman's View.

On December 31, 2014, the plaintiff loaned Chairman's View $312,500 at Richard's request. Chairman's View executed a demand promissory note in that amount, with interest, to the plaintiff. On September 30, 2015, again at Richard's request, the plaintiff loaned Chairman's View an additional $58,000 and Chairman's View executed another demand promissory note with the same terms as the first.

On April 29, 2016, the plaintiff made a formal demand for payment on both notes, as Chairman's View had made no payments of principal or interest as of that date. Chairman's View failed to honor the demands, constituting an event of default on both notes. After meeting to discuss the defaults, the plaintiff and Chairman's View executed a blanket security agreement on July 5, 2016 (the Security Agreement). To secure the payment of both notes, the Security Agreement pledged all of Chairman's View's assets, including, but not limited to, "computer programs, patents and patent applicators, software, licenses," and all proceeds from the sale of those assets. The pledged assets included U.S. Patent No 960727842 for proprietary software (the Patent), which, the complaint alleges, on "knowledge and belief, . . . constitutes Chairman's View's nearly only—but significantly valuable—asset."

The Security Agreement, a copy of which was appended to the complaint, identified an address in West Lebanon as Chairman's View's principal place of business and required Chairman's View to "keep the Collateral free from any lien, security interest or encumbrance" and "defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to" the plaintiff. It also provided: "This Security Agreement and

2

all rights and obligations hereunder, including matters of construction, validity and performance, shall be governed by the laws of the State of New Hampshire." The plaintiff perfected her security interest on July 5, 2016.

Due to continued nonpayment, the plaintiff filed suit in superior court in late July 2016 to collect on the notes (the First Lawsuit). On August 18, 2017, the superior court entered judgment for the plaintiff in the First Lawsuit. The plaintiff filed a motion for post-judgment attachment on Chairman's View's assets on November 1, 2017, and a renewed motion to attach the Patent on February 3, 2018.

The complaint at issue here recounts a series of events during and after the pendency of the First Lawsuit through which the defendants, along with CSS and Sandmann, allegedly "engaged in a joint scheme to deliberately avoid paying [the plaintiff's] judgment, circumvent her security interest in the Patent, and abscond with the proceeds of license fees and sales that are rightfully [the plaintiff's]." Specifically, the complaint alleges that in November 2016, Richards organized CoreValue and, approximately five weeks later, Sandmann incorporated CSS. At some point during the timeline relevant to this action, Sandmann had become employed by Chairman's View. He subsequently became vice president and, finally, in 2016, president.

On October 2, 2017, after the judgment in the First Lawsuit had become final and without the plaintiff's knowledge or consent, Chairman's View recorded an assignment of the Patent to CoreValue in the United States Patent and Trademark Office. As the Patent was Chairman's View's only significant asset, its assignment to CoreValue essentially rendered Chairman's View insolvent. At approximately the same time, CoreValue licensed the Patent to CSS, in return for which "Sandmann agreed to give up all of his ownership in Chairman's View."

On April 24, 2018, the superior court granted the plaintiff permission to attach the Patent, but, as detailed above, the Patent had already been assigned to CoreValue. The complaint alleges that Richards and CoreValue continue to receive license fees, and that they, as well as Sandmann and CSS, continue to receive revenue from marketing the software covered by the Patent "despite [the plaintiff's] security interest in the Patent's proceeds and, accordingly, her priority interest in and to those revenues and license fees." Based on these factual allegations, the complaint alleged claims for breach of contract, enforcement of a security interest, fraudulent transfer, consumer fraud, civil conspiracy, and piercing the corporate veil.

The defendants moved to dismiss on the ground that the court lacked personal jurisdiction over them. The plaintiff objected. Following a non-evidentiary hearing, the court denied the motion. The court noted that the plaintiff had not argued that the court had general personal jurisdiction over

3

the defendants, and, therefore, the court limited its analysis to specific jurisdiction.  It concluded that all requirements for such jurisdiction were met and ruled that "exercising specific jurisdiction in this case is consistent with notions of fair play and substantial justice."

On appeal, the defendants argue that the trial court erred in finding that: (1) the plaintiff pled specific jurisdiction or facts to support specific jurisdiction as to them; and (2) "specific jurisdiction over [the defendants] is consistent with notions of fair play and substantial justice."

"Our standard of review for rulings on motions to dismiss for lack of personal jurisdiction varies according to the case's procedural posture." Kimball Union Academy v. Genovesi, 165 N.H. 132, 136 (2013).  "When, as in this case, the trial court rules upon the motion without holding an evidentiary hearing, the trial court employs a prima facie standard, and we review the trial court's decision de novo." Id. (quotation omitted).  Under the prima facie standard, the inquiry is "whether the plaintiff has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." Id. (quotation omitted).  "The plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts." Id. (quotation and brackets omitted).  "Both the trial court and we, when undertaking de novo review, must accept the plaintiff's (properly documented) proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Id. (quotation omitted).  "The plaintiff's evidentiary proffers must be construed in the light most congenial to the plaintiff's jurisdictional claim and facts put forward by the defendant may be considered only if they are uncontradicted by the plaintiff's submissions." Id. (quotations and brackets omitted).

"Determining whether a court may exercise personal jurisdiction over a [defendant] contemplates a two-part analysis." N.H. Bank Comm'r v. Sweeney, 167 N.H. 27, 32 (2014).  "First, the State's long-arm statute must authorize such jurisdiction.  Second, the requirements of the federal Due Process Clause must be satisfied." Id. (quotation omitted).  To the extent that any of the defendants' arguments could be interpreted as contending that the long-arm statute's requirements are not met in this case, we decline to address those arguments given the defendants' acknowledgement that "[b]ecause New Hampshire's [long-arm statute], RSA 510:4, authorizes a court to exercise personal jurisdiction to the extent permissible under the Due Process Clause, the analysis depends upon due process." See RSA 510:4, I (2010); Sweeney, 167 N.H. at 32 (noting that "the due process analysis is normally dispositive").

"Under the Federal Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant if the defendant has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Kimball Union

Academy, 165 N.H. at 138 (quotation omitted). "'[M]inimum contacts' is not necessarily a numbers game"; "in order to be subject to the jurisdiction of the forum state, a nonresident need have only one contact with the forum, so long as the contact is meaningful." Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994). "Jurisdiction can be 'general,' where the defendant's contacts with the forum State are continuous and systematic, or 'specific,' where the cause of action arises out of or relates to the defendant's forum-based contacts." Staffing Network v. Pietropaolo, 145 N.H. 456, 458 (2000) (quotations omitted).

Although the defendants advance certain arguments related to general jurisdiction, we construe those arguments as subsidiary to their main contention that the plaintiff's proffered evidence falls short of meeting her burden of establishing specific jurisdiction over them. Because we need only address the defendants' primary contention to resolve this appeal, we undertake an analysis of specific, rather than general, personal jurisdiction.

To determine whether exercising specific personal jurisdiction over the defendants comports with due process, we examine whether: "(1) the contacts relate to the cause of action; (2) the [defendants] have purposefully availed themselves of the protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the [defendants] to defend the suit in New Hampshire." Sweeney, 167 N.H. at 33. "Each factor must be evaluated on a case-by-case basis, and all three factors must be satisfied for the exercise of jurisdiction to be constitutional." Id.

As an initial matter, the defendants claim that the trial court erred in ruling that a separate analysis of each count was unnecessary, and, specifically, "failed to consider the elements of the Plaintiff's causes of action, separately in contract or tort." We agree. "Questions of specific jurisdiction are always tied to the particular claims asserted." Phillips Exeter Academy v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999) (commending trial court's "decision to analyze the contract and tort claims discretely"). Here, the complaint alleges one claim for breach of contract and a number of common law and statutory claims that sound in tort or are predicated upon the defendants' allegedly tortious conduct. See Sugartown Worldwide LLC v. Shanks, Civil Action No. 14-5063, 2015 WL 1312572, at *5, *14 n.6 (E.D. Pa. Mar. 24, 2015) (treating statutory cause of action for fraudulent transfer as analogous to an intentional tort for purposes of personal jurisdiction analysis).

The trial court acknowledged that "[o]rdinarily, individual claims must be separately assessed for specific personal jurisdiction purposes," but concluded that "a separate analysis of each count [was] unnecessary" in this case because "all six of the plaintiff's claims arise out of the same factual underpinning—the alleged improper transfer and subsequent license of the Patent." The relevant inquiry, however, is not whether claims arise out of the "same factual underpinning," as the trial court found here, but whether they arise out of the

5

"same forum contacts," ERC Midstream v. American Midstream Ptnrs, 497 S.W.3d 99, 107 (Tex. App. 2016). These contacts, in turn, must relate to the cause of action. See Sweeney, 167 N.H. at 33. Because that determination requires examining the elements of the cause of action, and the elements differ in tort and contract cases, we conclude that the court erred in failing to analyze the contract and tort-related claims separately. See Phillips Exeter Academy, 196 F.3d at 289.

We conclude that all of the "tort-related" claims, however, can be analyzed together, because the contact for all such claims is the alleged commission of tortious acts in New Hampshire. See ERC Midstream, 497 S.W.3d at 107 (observing that court need not "analyze jurisdictional contacts on a claim-by-claim basis . . . if all claims arise from the same forum contacts"). In addition, because each of the defendants is alleged to have participated in the fraudulent acts and scheme underlying each of the tort-related claims, we conduct a single due process analysis with respect to all defendants on these claims. In light of the foregoing, we now conduct a separate, de novo, analysis of the contract and tort-related claims. See Kimball Union Academy, 165 N.H. at 136.

"To satisfy the relatedness factor, there must be more than just an attenuated connection between the contacts and the claim; the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case." Petition of Reddam, 170 N.H. 590, 599 (2018) (quotation omitted). The relatedness test is a "flexible, relaxed standard," and "[t]he court's assessment of relatedness is informed by the concept of foreseeability." Id. (quotations omitted).

The first count alleges that Chairman's View breached the Security Agreement by assigning the Patent to CoreValue without the plaintiff's knowledge or approval and in derogation of her perfected security interest. When Chairman's View executed the Security Agreement in July 2016, it maintained a physical address, a principal place of business, and the authority to do business in this state. See Phillips Exeter Academy, 196 F.3d at 289 (noting that "[i]n contract cases, a court charged with determining the existence vel non of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach"). In addition, the Security Agreement is expressly governed by New Hampshire law. We, therefore, conclude that the parties' contractual relationship is "centered in" New Hampshire. Mullins v. TestAmerica, Inc., 564 F.3d 386, 402 (5th Cir. 2009). "Because the very document that represents [Chairman's View's] forum-related activity is itself the cause and object of" the breach of contract claim, "this activity . . . [is] related to" that claim. Pritzker, 42 F.3d at 61. Furthermore, in cases involving contracts, "[a] finding of jurisdiction will be more likely if we find 'plus' factors in addition to the mere existence of a

6

contract with a New Hampshire resident." Staffing Network, 145 N.H. at 458 (describing "plus" factors). Two such factors are present here: the Security Agreement included a choice of law provision specifying that it would be governed by New Hampshire law, and bore an address in New Hampshire purporting to be Chairman's View's principal place of business. Sweeney, 167 N.H. at 34. We conclude that the relatedness test is satisfied as to the first count.

With respect to the remaining, tort-related claims, the defendants do not challenge the near-tautology that the commission of tortious acts relates to the plaintiff's causes of action sounding in tort; rather, they challenge the sufficiency of the alleged contact with New Hampshire. The defendants contend that "[a]ll decisions governing the security agreement and transfer of the patent were made in Vermont, Texas or Massachusetts, but not in New Hampshire." The alleged contact found sufficient by the trial court, however, was not the situs of decision-making, but the situs of injury. Cf. Kimball Union Academy, 165 N.H. at 137 (noting, with respect to the requirements of the New Hampshire long-arm statute, that "[f]or jurisdictional purposes, a party commits a tortious act within the State when the injury occurs in New Hampshire even if the injury is the result of acts outside the State" (quotation omitted)). The trial court found "little doubt that any injury from the alleged improper transfer of the Patent would be felt in New Hampshire."

Nevertheless, the defendants argue that, under the Supreme Court's decision in Walden v. Fiore, 571 U.S. 277 (2014), "mere effects in the forum state are insufficient to confer personal jurisdiction." They assert that "the Plaintiff alleges injury in New Hampshire because she resides in New Hampshire," and contend that this connection is insufficient.

In Walden, the Supreme Court held that a court in Nevada could not "exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada" where "the defendant had no other contacts with Nevada." Walden, 571 U.S. at 279. The Court noted that its holding was consistent with Calder v. Jones, 465 U.S. 783 (1984). Walden, 571 U.S. at 289-90. In Calder, the Court held that a California court could properly exercise personal jurisdiction over Florida defendants whose "intentional, and allegedly tortious, actions were expressly aimed at California." Calder, 465 U.S. at 785-86, 789. The Walden Court explained:

> Calder made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum

State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

Walden, 571 U.S. at 290.

We conclude that the salient jurisdictional facts of this case are more akin to those in Calder than those in Walden, and we note that they are similar to cases in other jurisdictions that have found the so-called "Calder effects test" was met. Indeed, the United States Bankruptcy Court for the District of New Mexico observed that "[c]ourts have held with near uniformity that they have personal jurisdiction to hear fraudulent transfer cases under the Calder analysis, even when the transfer is the only contact between the debtor and the foreign transferee." In re Akbari–Shahmirzadi, No. 11-15351-t11, 2016 WL 6783245, at *3 (Bankr. D.N.M. Nov. 14, 2016). This is especially so where the fraudulent transfer hinders the collection of a judgment previously issued by a court in the forum state or would impair rights under a contract connected to the forum. See, e.g., Mullins, 564 F.3d at 390, 398 (concluding that specific jurisdiction existed over out-of-state defendants who "purposefully aimed their [fraudulent] conduct at [the corporate plaintiff] in Texas . . . with the knowledge that their conduct would allegedly impair the rights of a single, major creditor and Texas resident under agreements that center around Texas"); Gambone v. Lite Rock Drywall, 288 F. App'x 9, 11, 13, 14 (3d Cir. 2008) (concluding that non-resident third-party defendant had the necessary minimum contacts with Pennsylvania where he "participated in a fraudulent conveyance . . . for the purpose of preventing the plaintiffs, who are Pennsylvania creditors, from collecting on a judgment rendered in their favor by a court in Pennsylvania, . . . and thus 'expressly aimed' his conduct at the forum"); Sourcing Mgmt., Inc. v. Simclar, Inc., 118 F. Supp. 3d 899, 903, 910 (N.D. Tex. 2015) (noting that plaintiff made "a prima facie showing that all or substantially all of [one defendant's] assets . . . were transferred to [another defendant] as part of a scheme to prevent Plaintiff, a Texas creditor, from collecting its Texas judgment"). Here, where the alleged tortious conduct impaired both the collection of a New Hampshire judgment and the plaintiff's rights under the New Hampshire-based Security Agreement, the occurrence of injury in New Hampshire is not based solely on the plaintiff's residence but upon the defendants aiming their allegedly tortious actions at this state. See Calder, 465 U.S. at 789.

We are also not persuaded by the defendants' argument that "the situs of a tort involving a patent and its transfer . . . cannot be easily determined to be where the Plaintiff resides" because "[a] patent is intellectual property, which is an intangible asset with no physical substance that is ultimately governed under federal patent law." That the fraudulently-conveyed asset is a patent is immaterial; we note that Gambone involved a motion to implead the recipients of certain allegedly fraudulently-conveyed patents "and to restrain further

8

transfer of the patents." Gambone, 288 F. App'x at 11. The pertinent facts here are that the transfer of the Patent thwarted collection on a New Hampshire judgment and breached a contract centered in New Hampshire. We conclude that the relatedness factor is satisfied.

The second prong of the due process analysis considers whether the defendants "have purposefully availed themselves of the protection of New Hampshire's laws." Sweeney, 167 N.H. at 33. "To satisfy the second requirement, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." State v. N. Atlantic Ref. Ltd., 160 N.H. 275, 283-84 (2010) (quotation omitted). "Purposeful availment requires both foreseeability and voluntariness." Sweeney, 167 N.H. at 34. "Voluntariness requires that a [defendant's] contacts with the forum state proximately result from actions by the [defendant]." Id. "The contacts must be deliberate and not based on the unilateral actions of another party," and "cannot be merely fortuitous, but rather, the [defendants] must have purposefully directed actions at New Hampshire." Id. "Foreseeability requires that the contacts must be of a nature such that a [defendant] could reasonably anticipate being haled into court here." Id.

With respect to Chairman's View and the breach of contract claim, we conclude that the purposeful availment prong is met. Chairman's View entered into the Security Agreement with a New Hampshire resident when Chairman's View itself was registered to do business in New Hampshire and had both a physical address and its principal place of business in this state. The Security Agreement specifically provided that it was to be governed by New Hampshire law. These contacts with New Hampshire were not fortuitous and, by voluntarily entering into such an agreement, Chairman's View "could reasonably have anticipated being haled into court here." Id. at 35; cf. Computac, Inc. v. Dixie News Co., 124 N.H. 350, 354 (1983) (concluding that purposeful availment prong was satisfied where defendant "voluntarily entered into a contract with a New Hampshire corporation, knowing that the contract had substantial connections to New Hampshire").

Likewise, accepting the plaintiff's proffers as true for purposes of our review under the prima facie standard, see Kimball Union Academy, 165 N.H. at 136, we conclude that, by committing the tortious acts alleged in the remaining counts, the defendants purposely availed themselves of the privilege of conducting activities in New Hampshire. Many of the same factors that led us to conclude that the relatedness prong is met — in particular, the allegedly intentional direction of activities to impair both the collection of a New Hampshire judgment and the plaintiff's rights under a New Hampshire-centered contract — lead us to conclude that the purposeful availment prong is also met. See Mullins, 564 F.3d at 395, 402 (New York defendant "should

9

reasonably have anticipated being haled into a Texas court for precipitating and directing an alleged fraudulent transfer at the expense of a known, major creditor in Texas whose right to payment arises out of contracts that share a strong connection with Texas"); Universitas Educ., LLC v. Nova Group, Inc., Nos. 11CV1590-LTS-HBP, 11CV8726-LTS-HBP, 2014 WL 3883371, at *6 (S.D.N.Y. Aug. 7, 2014) ("The conduct of tortious activity targeted at a New York entity and a New York judgment suffices to demonstrate that the . . . Respondents should reasonably have anticipated being haled into court here.").

Having found the first two prongs satisfied, we now turn to the third: whether "it would be fair and reasonable to require the [defendants] to defend the suit in New Hampshire." Sweeney, 167 N.H. at 33. "For this determination, we examine the five so-called 'gestalt factors,'" which are: "the burden on the [defendant]; the forum state's interest in adjudicating the dispute; the [plaintiff's] interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies." Id. at 37-38 (quotation omitted).

With respect to the first factor, the proximity of the states involved minimizes the burden on the defendants: we agree with the trial court that "[i]t is not particularly onerous for a business executive to travel from Vermont to New Hampshire." As to the second factor, "New Hampshire has a manifest interest in providing redress to its residents for a non-resident's breach of contract," Computac, Inc., 124 N.H. at 355, and concomitant fraudulent transfer, see Sugartown Worldwide LLC, 2015 WL 1312572, at *8 (noting Pennsylvania's manifest interest in providing effective means of redress to Pennsylvania corporation seeking to set aside allegedly fraudulent transfers). New Hampshire also has a strong interest in "protecting the legitimacy of its court judgments." Universitas Educ., LLC, 2014 WL 3883371, at *7. The third factor also weighs in favor of exercising jurisdiction, as the plaintiff's interest in obtaining convenient and effective relief is furthered by providing her a means of redress in her home state. The fourth factor is neutral, as the plaintiff could have sued all defendants in the neighboring state of Vermont. See id. Finally, "the states have a shared interest in preventing fraudulent conveyances," id., and in enforcing contracts and providing recourse for breach, see Napoli, Bern, Ripka, Shkolnik & Assocs., LLP v. Stratos Legal Servs., No. 14-18-00420-CV, 2019 WL 2589885, at *10 (Tex. App. June 25, 2019) (noting that "the several states share an interest in furthering freedom of contract with access to efficient legal recourse"). Accordingly, we agree with the trial court that "the gestalt factors . . . overwhelmingly disfavor dismissal in this case," and, for the foregoing reasons, we reject the defendants' argument that "the trial court's weighing of the traditional notions of fair play and substantial justice violates the Due Process Clause."

Although the trial court erred in failing to separately analyze the plaintiff's contract and tort-related claims, it reached the correct result, and we therefore affirm. Because we disagree with the plaintiff's assertion that this appeal is "specious," we deny her request for an increase in the statutory interest rate and an award of "all expenses she has incurred in this appeal, including her reasonable attorneys' fees."

<u>Affirmed</u>.


HANTZ MARCONI and DONOVAN, JJ., concurred.