**BANK LEUMI USA, Plaintiff,**

v.

**David EHRLICH, et al., Defendants.**

**No. 12–cv–4423 (AJN).**

United States District Court,
S.D. New York.

Signed March 23, 2015.

James Ancone, Mark Hanchet, Mayer Brown LLP, New York, NY, for Plaintiff.

Jose Raul Alcantar Villagran, Ropes & Gray LLP, New York, NY, for Defendants.

## MEMORANDUM & ORDER

ALISON J. NATHAN, District Judge:

On June 5, 2012, Plaintiff Bank Leumi USA ("BLUSA") filed this action seeking a declaration that: (1) the contractual limitation on BLUSA's liability with respect to the brokerage accounts of David Ehrlich, Enrique Ehrlich, Sara Goldstein, and Angela Tykocki (the "Defendants") is valid and enforceable; (2) that BLUSA is not liable in contract or tort for the losses Defendants suffered after their purchase of bonds issued by Kaupthing Bank (the "Bonds"); and (3) that BLUSA has no

obligation to refund the amounts Defendants paid to purchase the Bonds. Compl. ¶¶ 55–64. After significant procedural delays, the Defendants filed an amended answer and counterclaim on April 18, 2014 stating, *inter alia,* that this Court lacks jurisdiction over BLUSA's claim and that venue is inappropriate in the Southern District of New York. *See* Am. Answer ·& Countercl. ¶¶ 65–68 ("AAC"). In the alternative, if this Court does in fact have jurisdiction and venue is appropriate, Defendants bring a number of counterclaims, including a private cause of action under the Investment Advisors Act ("IAA"), *id.* ¶¶ 195–203, breach of fiduciary duty, *id.* ¶¶ 204–209, negligence, *id.* ¶¶ 210–213, and breach of contract. *Id.* ¶¶ 214–219.

·The parties now each move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. Nos. 82, 88. Defendants' motion contends that this Court lacks jurisdiction over them, that venue is inappropriate, and further asks that the Court invoke the doctrine of *forum non conveniens.* Plaintiff moves for summary judgment on their proposed declaratory judgment and also on each of the Defendants' counterclaims. For the reasons below, the Defendants' motion is DENIED and BLUSA's motion is GRANTED.

## I. BACKGROUND

This case primarily concerns a number of brokerage accounts the Defendants opened with BLUSA in 2002 and the ensuing losses Defendants experienced through trades made in those accounts. BLUSA is a full-service commercial bank offering both U.S.-based and international private banking services. *See* Dkt. No. 92 ("Second Ancone Declaration"), Ex. T ¶¶ 2–3. BLUSA is headquartered in, and organized under the laws of, New York. *Id.* ¶¶ 5, 8. BLUSA is owned almost entirely by the Bank Leumi Israel Corporation ("BLIC"), which is also organized under New York law. *Id.* BLIC is, in turn, owned by Bank Leumi le-Israel B.M., which is organized under the laws of Israel. *Id.* ¶ 10. ·

### a. Defendants' Brokerage Accounts with BLUSA

On September 17, 2002, Defendants applied to open three brokerage accounts (the "Accounts") with BLUSA. *See* Second Ancone Decl., Exs. A, B, C; *see also* Dkt. No. 84 ("Bittker Declaration"), Exs. A, B, C. Defendants, who are all Uruguayan citizens, visited the Bank Leumi (Latin America) S.A. ("BLLA") offices in Montevideo, Uruguay in order to fill out their applications. *See* Dkt. No. 10 ("Defendants' Declaration") ¶ 14. Like BLUSA, BLLA is a subsidiary of Bank Leumi le-Israel B.M. and, although BLLA is not itself able to open BLUSA .international accounts, clients can apply for BLUSA accounts at BLLA offices. Second Ancone Decl., Ex. T ¶¶ 11, 12, 23.

At the BLLA offices in Montevideo, the Defendants each completed and signed a BLUSA "International Account Application" (the "Applications"), which, *inter alia,* stated that the signatories "confirm[ed] receiving a copy of, and agreeing to, the International Account Terms." Second Ancone Decl., Exs. A, B, C. These International Account Terms (the "Terms") included several provisions which constitute the primary areas of dispute in this case. First, the Terms defined the "Agreement" between BLUSA and Defendants as being comprised of the "Account Application and these International Account Terms including any Optional Provisions selected by you on the Account Application." Second Ancone Decl., Ex. D at 1 ("IAT"). Second, the Terms included a forum selection clause stating as follows.

Governing Law; Jurisdiction; Service of Process—THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE UNITED STATES OF AMERICA. Any legal proceeding arising from or in any way related to this Agreement may be brought in, and you hereby consent to personal jurisdiction and venue or, any state or federal court located in New York County, New York, U.S.A. You hereby consent to the service of process in any such action, by mailing a copy of such process to you at your last known address shown on our records."

*Id.* at 8.

Third, the Terms contained a provision disclaiming any obligation by BLUSA to provide the Defendants with investment advice. It stated, in relevant part:

*Investment Advice; Bank's Liability; Fees.*

a. Neither the Bank nor its officers or employees provide investment advice relating to the purchase or sale, pursuant to this Agreement, of foreign currencies or financial assets. Investment advice is available from the Bank only if you enter into an Investment Management Agreement with the Bank and then only in circumstances provide for in that Investment Management Agreement

. . .

*Id.* at 20.

These Applications, once completed, were sent to BLUSA in New York, which then opened the Accounts for Defendants. *See* Second Ancone Deck, Ex. T ¶¶ 11–12, 23–24. The Defendants used the Accounts through 2011. *Id.*, Exs. H, I, J, K. During this time they purchased and sold at least $11 million worth of securities in at least fifty-nine different transactions. *Id.* One such transaction occurred on February 21, 2008, when Defendants signed order forms instructing BLUSA to purchase $750,000 worth of bonds issued by Kaupthing, an Icelandic bank. *Id.*, Exs. F, G.[1] That same day, BLUSA executed the orders in New York and purchased the Bonds at a total face value of $750,000. *See* Bittker Decl. ¶¶ 10–12, Ex. G at 1, Ex. H at 1. Approximately eight months later, on October 9, 2008, Kaupthing Bank defaulted on its debt, effectively rendering Defendants' bonds worthless. *See* Dkt. No. 83 ("First Ancone Declaration") ¶ 118(1); Bittker Decl., ¶¶ 17–18, Ex. K at 3, Ex. L at 3.

### b. Procedural History of the Case

The course of this litigation has been erratic. Several years after Kaupthing's default, counsel for Defendants sent BLUSA a letter asking that they reimburse Defendants for the purchase price of the Bonds plus interest. *See* Bittker Decl., Ex. M. The letter threatened legal action in Uruguay and BLUSA accordingly filed this action in the Southern District of New York seeking a declaration that it had no liability in tort or contract as to Defendants' purchase of the bonds. *Id.*

In July 2012, Defendants filed a motion to dismiss, arguing that this Court lacked personal jurisdiction over them, that venue was inappropriate in New York, and fur-

---

**1.** Specifically, Defendant Enrique Ehrlich signed an order form instructing BLUSA to purchase $515,000.00 of bonds issued by Kaupthing Bank. *See* Bittker Decl., Ex. E. David Ehrlich signed a second order on the same day instructing BLUSA to purchase $235,000.00 of the same bonds issued by Kaupthing for his own account. *Id.*, Ex. F. The order forms signed by David and Enrique Ehrlich stated that they undertook the transaction at their "sole risk" and that the financial assets selected were chosen "without the bank advising [them] in this matter." *Id.*, Exs. E, F.

ther that this Court posed a *forum non conveniens* for this dispute. *See* Dkt. No. 8. In February 2013, the Court denied Defendants' motion. *See* Dkt. No. 25 (the "Prior Order"). Shortly thereafter, Defendants' counsel sought to withdraw from the case. *See* Dkt. No. 30. The Court granted counsel's request and instructed the Defendants that they had 30 days to find new counsel, cautioning that failure to abide by the terms of the order could result in adverse action, including entry of default judgment. *See* Dkt. No. 31. In April 2013, the Defendants filed a declaration with the Court explaining that they were withdrawing from the action, reiterating their belief that the Court lacked jurisdiction over them and declaring their intention to pursue legal remedies in Uruguay. *See* Dkt. No. 33. In May 2013, the Court issued an order explaining to Defendants that their conduct put them at risk of a default judgment and offered them a final chance to present a defense. *See* Dkt. No. 34.

Defendants, initially, did not heed the Court's warning and on June 18, 2013, certificates of default were issued as to each Defendant by the Clerk of Court. *See* Dkt. Nos. 34–37. The next day, on June 19, 2013, BLUSA filed an order to show cause as to why Defendants should not have default judgment entered against them. *See* Dkt. No. 38. The Court set an August 7, 2013 hearing date and ordered Defendants to respond to the order by July 24, 2013. *Id.*

After several months of silence, the Defendants re-emerged. On July 22, 2013, two days before they were required to show cause, Defendants' present defense counsel entered a notice of appearance and explained that he intended to seek relief, pursuant to Rule 60(b), from the Court's Prior Order denying their motion to dismiss. *See* Dkt. No. 39. After the parties

briefed the issue, the Court issued an order on February 18, 2014 denying Defendants' request for relief and their request for reconsideration of their motion to dismiss. *See* Dkt. No. 58. The Court did, however, deny BLUSA's requested default judgment, finding that the Defendants had "shown credible evidence of facts that would constitute a complete defense" regarding personal jurisdiction, provided they were able to demonstrate that the Terms did not govern the parties' agreement. *Id.*

Finally, on March 3, 2014, nearly two years after BLUSA first brought this action, Defendants filed an answer and counterclaim. *See* Dkt. No. 60. The parties then set a schedule for the case and commenced discovery. After further procedural back-and-forth, on June 20, 2014, the Court administratively denied BLUSA's motion to dismiss the Defendants' counterclaim and set a schedule for summary judgment. The parties now each move for summary judgment. For the reasons below, Defendants' motion is DENIED and BLUSA's motion is GRANTED.

## II. LEGAL STANDARD

Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 45 (2d Cir. 2000). For summary judgment purposes, a genuine issue exists if the evidence is such that a reasonable jury could decide in the non-moving party's favor. *Id.*

In a summary judgment setting, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22

F.3d 1219, 1223 (2d Cir.1994). However, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence ... on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir.2009). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted). "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citations omitted).

## III. DISCUSSION

The parties each move for summary judgment. Defendants, putting stock in Shakespeare's adage regarding luck and third tries,[2] bring, once again, virtually identical arguments challenging the Court's jurisdiction, the appropriateness of this venue, and the applicability of the doctrine of *forum non conveniens*. *See* Dkt. No. 88. BLUSA seeks summary judgment on its request for a declaration concerning its contract and tort liability, and further seeks summary judgment on Defendants' counterclaims. *See* Dkt. No. 82. The Court first addresses two questions predicate to Defendants' motion-the applicability of the law of the case doctrine and the Defendants' novel theory regarding the applicability of the Terms.

### a. Defendants' Motion for Summary Judgment

#### i. The Law of the Case Doctrine

BLUSA contends that the Court need not reach the merits of the Defendants' motion because the Prior Order denying the Defendants' motion to dismiss already addressed each of the issues raised in the present motion. Plaintiff contends that under the law of the case doctrine the Court is bound by its previous ruling on these questions of law, or, at a minimum, has a serious obligation not to upset already settled issues. While BLUSA is certainly correct in noting that the Defendants' latest arguments regarding jurisdiction amount to little more than a "copy and paste" job, they are nonetheless incorrect in asserting that the law of the case doctrine is in effect.

 The law of the case doctrine stands for the simple proposition that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 953 (2d Cir.1964). It is motivated by "considerations of fairness to the parties, judicial economy, and the societal interest in finality." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir.2009). Nonetheless, the doctrine is applied at the Court's discretion. As Judge Learned Hand explained, "the 'law of the case' does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Higgins v. California Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir.1924). Generally a Court will only revisit its previous decision in instances of

---

**2.** Falstaff: Prithee, no more prattling; go. I'll hold. This is the third time; I hope good luck lies in odd numbers. Away I go. They say there is divinity in odd numbers, either in

nativity, chance, or death. Away! WILLIAM SHAKESPEARE, THE MERRY WIVES OF WINDSOR act V, sc. 1.

"an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790. *See also Carr*, 557 F.3d at 102.

█ The Court need not determine whether one of these exceptions to the doctrine exists in this case.[3] "[B]ecause of the divergent standard of review applicable to motions to dismiss and motions for summary judgment, the law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of fact have been raised which survive summary judgment." *McAnaney v. Astoria Fin. Corp.*, 665 F.Supp.2d 132, 142 (E.D.N.Y.2009). *See also Nobel Ins. Co. v. City of New York*, 00–cv–1328 (KMK), 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) (collecting cases). *Cf. United States v. Johnson*, 616 F.3d 85, 93 (2d Cir.2010) (noting that the law of the case doctrine does not usually apply when appeals in the same case are governed by different standards of review).

█ In sum, because the Court is now asked to determine whether any dispute of material fact exists regarding the Court's jurisdiction over this case, as compared to whether or not Plaintiff adequately alleged jurisdiction so as to survive a Rule 12(b) motion, the Court must undertake renewed examination of Defendants' arguments. Nonetheless, Judge Hand's insight rings true and the Court, using its good sense, will rely on the reasoning of the Prior Order as appropriate, particularly in instances where Defendants have adduced no additional facts or cases in support of their arguments.

### ii. The Applicability of the International Account Terms

█ The main thrust of the Defendants' motion for summary judgment is that they are not bound by the Terms and, accordingly, that its forum selection clause is not in effect. The Defendants' instead argue that their Accounts were governed by the International Financial Services Arrangements ("Arrangements") or, in the alternative, were not governed by any supplemental contract terms at all due to Bank Leumi's fraud or incompetence. The Defendants' argument is not entirely without merit, as the Court recognized in its February 18, 2014 order.[4] Nonetheless, the Court now rejects the Defendants' theory.

There is no dispute that on or around September 17, 2002, each of the Defendants signed a "BLUSA International Account Application." *See* Second Ancone Decl., Exs. A, B, C. Each of these applications included a Customer Agreement section stating that the signatory "confirms receiving a copy of, and agreeing to, the International Account Terms." *Id.* The parties now dispute exactly what is referred to by the phrase "International Account Terms."

BLUSA offers the more straightforward explanation. Namely, that the International Account Terms refer to just that—

---

**3.** Defendants have put forward at least some additional facts, including the existence of the Arrangements and the deposition testimony of Mssrs. Bittker and Ganz. However, as the Court's analysis below makes clear, these additional facts do not materially alter the Court's prior conclusions.

**4.** At that time the Court concluded "that Defendants have shown credible evidence of facts that would constitute a complete defense, a lack of personal jurisdiction, if, as they hope to show, the International Account Terms did not govern the parties' agreement." *See* Dkt. No. 58 at 4.

the so-called International Account Terms. The Terms state plainly, in their very first sentence, that "These are the 'International Account Terms' referred to in the International Account Application." IAT at 3. The Terms further explain that they, in conjunction with the Application, the International Fee Schedule, and the Funds Availability Disclosure, constitute the entirety of the agreement between BLUSA and the account holders. *Id.*

The Defendants present a different theory. They contend the Arrangements are the International Account Terms referred to in the Application, despite the inconsistent terminology. In support of this belief, the Defendants point to the following text in the introductory section of the Arrangements:

> This booklet is the International Financial Services Arrangements (the "Arrangements") referred to in the International Account Application (the "Application") and sets forth terms applicable to financial services provided through the Private Banking and International Services Division [of BLUSA] **(For purposes of an Application form made available by BLUSA before July 2002, this booklet is the International Account Terms.)** The Arrangements, the Application, the International Fee Schedule [ ], the Funds Availability Schedule, and all Account opening documentation together constitute our agreement ...

Second Ancone Decl., Ex. E at 1.1 (emphasis added) ("IFSA").

The Defendants contend that by the time they signed the Applications in September 2002, the Terms had been supplanted by the Arrangements, or, in the alternative, BLUSA had failed to make clear which set of supplementary terms

applied to the Defendants' Accounts. Thus, they are not bound by the Terms' forum selection clause.

 "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 157 (2d Cir.2000) (citing *Mellon Bank, N.A. v. United Bank Corp. of New York,* 31 F.3d 113, 115 (2d Cir.1994)). "The question of whether the language of a contract is ambiguous is a question of law to be decided by the Court." *Malmsteen v. Universal Music Grp., Inc.,* 940 F.Supp.2d 123, 130 (S.D.N.Y.2013). Similarly, the "proper interpretation of an unambiguous contract" is also a "question of law for the court." *Reyes v. Metromedia Software, Inc.,* 840 F.Supp.2d 752, 755 (S.D.N.Y.2012) (quoting *Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir.2002)). A contract is "not ambiguous simply because the parties have urged conflicting interpretations." *Id.* (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993)).

The contract at issue in this case is wholly unambiguous and, based on the undisputed facts, plainly accords with BLUSA's proposed interpretation. BLUSA's reading is bolstered by two key considerations. First, and most importantly, the Applications the Defendants signed in September 2002 explicitly and unambiguously referred to the Terms, despite the contemporaneous existence of the Arrangements. If BLUSA had intended for the Arrangements to supplant the Terms for purposes of the Defendants' Accounts, it would have offered them applications explicitly referring to the Arrangements.[5] Second, the

---

**5.** Indeed, the Arrangements themselves seem

to envision such explicit referral when they

actual drafter of the various supplemental contract provisions, Mr. Donald Bittker, testified that the Arrangements would only have applied to those applications explicitly referencing the Arrangements and, further, that the Arrangements would not have automatically supplanted the existing terms. *See* Second Ancone Decl., Ex. U at 27:2–28:18.

Comparatively, the Defendants draw support exclusively from one vague parenthetical located within the Arrangements. However, "a court must give contract terms their plain meaning" and can only find ambiguity "if a term is reasonably susceptible to more than one interpretation *by reference to the contract alone*." *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F.Supp.2d 428, 440 (S.D.N.Y. 2010) (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir.2000) (emphasis added)). The Defendants in effect ask the Court to look to a document not explicitly referred to within the Application in order to define a plain term within that very document. But such bootstrapping is not a permissible form of contract construction. *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y.2013) (quoting *Howard v. Howard*, 292 A.D.2d 345, 345, 740 N.Y.S.2d 71 (N.Y.App.Div. 2002) ("It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations.")). *See also Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) ("The mere assertion of an ambiguity [in a contract] does not suffice to make an issue of fact.").

Moreover, even if the Court did refer to the Arrangements in order to interpret the Applications, Defendants have failed to demonstrate the absence of a genuine dispute of material fact regarding the applicable terms. The Arrangements indicate that they apply to Applications made available before July 2002. *See* IFSA at 1.1. But Defendants' Applications were "made available" to them *after* July 2002 and thus, by its plain text, the parenthetical does not obviously apply to their Accounts. As Mr. Bittker testified, it was not BLUSA's intent to replace the Terms with the Arrangements for every single international brokerage account and it is more than plausible that BLUSA intended that certain accounts, including the Defendants', continue to be governed by the Terms. *See* Second Ancone Decl., Ex. U at 27:2–28:18. Accordingly, the Court concludes that no genuine dispute of material fact exists regarding what document the Applications contemplated when referring to the International Account Terms.[6]

state that "This booklet is the International Financial Services Arrangements (the "Arrangements") referred to in the International Account Application." *See* IFSA at 1.1.

6. Although the Court need not decide the issue, it is not obvious that anything would be materially altered if the Arrangements were, in fact, in effect. The Arrangements also contain a forum selection clause stating that the Account Holders consent to "[a]ny legal proceedings or actions arising out of or relating to your Accounts or the Agreement may be brought in, and you consent to personal jurisdiction and venue of, any State or Federal court located in the county where you opened the Account, or, *if you open the Account at the offices of a Bank BLUSA affiliate, in the County of New York, State of New York*." *See* IFSA at 1.33 (emphasis added). There is no dispute that the Defendants opened their accounts at a BLUSA affiliate, BLLA, and thus consented to personal jurisdiction and venue in New York. Under the *Phillips* standard discussed *infra*, it does not appear that any material difference exists on this issue as to the Arrangements compared to the Terms.

### iii. The Enforceability of the Forum Selection Clause

Having determined that the Terms are in fact the provisions referred to in the Defendants' Applications, the Court now turns to the substance of the Defendants' motion for summary judgment. The Defendants contend that, even if the Terms are applicable, the forum selection clause is not enforceable.

▇▇▇ A forum selection clause is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Baosteel Am., Inc. v. M/V "OCEAN LORD"*, 257 F.Supp.2d 687, 688 (S.D.N.Y.2003) (quoting *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). To overcome this presumption of validity, the challenging party must meet the four-step inquiry laid out *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383–84 (2d Cir.2007). This four part test first inquires as to whether the forum selection clause "was reasonably communicated to the party resisting enforcement." *Id.* (citing *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir.2006)). Second, the Court must determine whether the clause is mandatory or permissive, in order to decide whether the parties "are *required* to bring any dispute to the designated forum or simply *permitted* to do so." *Id.* (citing *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs. Inc.*, 22 F.3d 51, 53 (2d Cir.1994)). "Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause." *Id.* (citing *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1358–61 (2d Cir.1993)). If the "forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable," then the final step is ascertaining whether "the resisting party has rebutted the presumption of enforceability by making a sufficient strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* (internal quotations removed).

▇▇▇ First, the Defendants declare that they were never provided with the Terms or even informed that the Terms existed. Defs.' Decl. ¶¶ 22–23. Further, they contend that the account officers at the BLLA office in Montevideo did not consistently provide the full set of account documents, including the Terms or Arrangements, to applicants. *See* Dkt. No. 89, Ex. 5 ("Ganz Deposition") at 72:10–74:3. Finally, they contend that their alleged lack of fluency in English should excuse them from understanding the terms and conditions of the Applications. *See* Dkt. No. 89 at 4 n. 3; Defs.' Decl. ¶ 14.

The Defendants' bald declaration that they never received the Terms is belied by the fact that they signed an application *expressly* acknowledging receipt of those terms. *See* Second Ancone Decl., Exs. A, B, C at 6. Even if the Terms were not provided to them at the time they signed the Applications, they were put on express notice that the additional terms were incorporated into their Agreement with BLUSA. The Court again turns to *Horvath v. Banco Comercial Portugues, S.A.*, 461 Fed.Appx. 61, 63 (2d Cir.2012), which is expressly on point. In *Horvath*, the party challenging the forum selection clause argued it had not been reasonably communicated to him because he did not understand Portuguese, the language in which the contract was written, and because he did not recall receiving a copy of certain supplemental terms akin the to the International Account Terms. *Id.* The panel expressly rejected these arguments, concluding that "[a]bsent substan-

tive unconscionability or fraud of a type not alleged here" it was the signatory's obligation to ensure he understood the document he knowingly signed. *Id.* (citing *AXA Versicherung AG v. N.H. Ins. Co.*, 391 Fed.Appx. 25, 30 (2d Cir.2010)).

Defendants grasp in their reply that, in *Horvath*, the resisting party consented to the contract in his native language, and that this distinguishes the two cases. Defendants' argument has no merit. While it is true that the party in *Horvath* signed a duplicate copy of the contract in his native English, *see Horvath v. Banco Comercial Portugues, S.A.*, 10–cv–4697 (GBD), 2011 WL 666410, at *1 (S.D.N.Y. Feb. 15, 2011), the Second Circuit's opinion does not mention this fact. Rather, the panel expressly rejected Horvath's argument that the forum selection clause "was not reasonably communicated to him because he does not understand Portuguese" because "parties are charged with knowing and understanding the contents of documents they knowingly sign." *Horvath*, 461 Fed.Appx. at 63. *See also AXA Versicherung AG*, 391 Fed.Appx. at 30 ("If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."); *Allied Dynamics Corp. v. Kennametal, Inc.*, 12–cv–5904 (JFB)(AKT), 2014 WL 3845244, at *11 (E.D.N.Y. Aug. 5, 2014) (quoting *MCC–Marble Ceramic Ctr.*, 144 F.3d 1384, 1387 n. 9 (11th Cir.1998)) ("We find it nothing short of astounding that an individual ... would sign a contract in a foreign language and expect not to be bound simply because he could not comprehend its terms. We find nothing in the CISG that might counsel this type of reckless behavior and nothing that signals any retreat from the proposition that parties who sign contracts will be bound by them regardless of whether they have read them or understood them.")

Moreover, the Defendants drastically exaggerate the practices of BLLA regarding their provision of account documents to clients. Defendants breezily state that "providing the International Account Terms is not a standard business practice of Plaintiff for accounts opened in Uruguay." *See* Dkt. No. 89 at 5. But what Mr. Ganz, the BLLA employee in Montevideo responsible for handling BLUSA Applications, actually stated was that he "offers the client the possibility of having [the International Account Terms] and, generally speaking, the client doesn't want them." *See* Ganz Dep. at 73:25–74:3. In other words, Mr. Ganz's usual practice was to offer the terms to prospective customers, who were in turn usually not interested in perusing the legalese contained therein. BLUSA, having made the Terms available to the Defendants, had no further obligation to ensure that the Defendants digested each and every clause of the Terms, particularly in light of their express reference in the Applications. *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir.1996) (parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent). Accordingly, the Court concludes, as before, that the forum selection clause was reasonably communicated to the Defendants.

Defendants next challenge the presumptive enforceability of the forum selection clause on the grounds that it is permissive, rather than mandatory. "For a forum selection clause to be deemed mandatory, jurisdiction and venue must be specified with mandatory or exclusive language. However, in the situation where only jurisdiction is specified, the clause will generally not be enforced without additional language indicating the intent of the parties to make jurisdiction exclusive."

*Macsteel Int'l USA Corp. v. M/V Larch Arrow, her engines, boiler, etc.,* 354 Fed. Appx. 537, 539 (2d Cir.2009) (citing *Central National–Gottesman, Inc. v. M.V. "GERTRUDE OLDENDORFF",* 204 F.Supp.2d 675, 678 (S.D.N.Y.2002)). The relevant portion of the forum selection clause reads, "Any legal proceedings arising from or in any way related to this Agreement may be brought in, and you hereby consent to personal jurisdiction and venue of, any state or federal court located in New York County, New York, U.S.A." *See* IAT at 8.

 The Defendants contend that the phrasing 'may be brought in' renders the clause permissive. Indeed, as the Court explained in the Prior Order, this language does make the clause facially permissive. However, the Court's Prior Order also explained that a forum selection clause, though facially permissive, may nonetheless be deemed mandatory if it "combines permissive forum selection language with an express waiver of venue objections." *Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.,* 11–CV–02589, 2011 WL 4005345, *2 (S.D.N.Y. Aug. 29, 2011). *See also Aguas Lenders Recovery Group v. Suez, S.A.,* 585 F.3d 696, 700 (2d Cir.2009) (holding that a permissive forum selection clause containing a waiver of any claims of *forum non conveniens* "amounts to a mandatory forum selection clause at least where the plaintiff cho[se] the designated forum") (citation removed). The provision at issue here states that the Defendants "consent to personal jurisdiction and venue" in New York, which the Court deemed to be the equivalent of waiver. Unlike its argument about the first *Phillips* prong, where Defendants cited deposition testimony and the Arrangements in support of their contention that the clause was not reasonably communicated to them, the Defendants cite absolutely no new fact or novel legal theory warranting departure

from the Court's earlier determination. *See* Prior Order 9–11.

Finally, the Defendants dispute the third *Phillips* factor by contending that they are not subject to the forum selection clause by virtue of the fact that they never received the Terms. The Court has already rejected this contention. *See, e.g., Horvath,* 461 Fed.Appx. at 63; *AXA Versicherung AG,* 391 Fed.Appx. at 30. Defendants cite an out of Circuit state court opinion in which the state appeals court deemed the presumption of enforceability overcome because the contract terms were "evidently structured in an unfair manner so that the clause would not appear on a purchaser's computer unless he or she scrolled down to display the 'submerged' clause ..." *Hoffman v. Supplements Togo Mgmt., LLC,* 419 N.J.Super. 596, 18 A.3d 210, 212 (N.J.App.Div.2011). Defendants contend that *Hoffman* presents a "far less egregious" set of facts than here and that accordingly this Court should likewise reject the validity of the forum selection clause. But Defendants are wrong on all counts. First, although Defendants opaquely offer *Hoffman* as an opinion of "the Appellate Division of the Superior Court," it is a New Jersey state case concerning New Jersey contract law. Accordingly, it has, at most, persuasive authority in this case.

Second, and more importantly, Defendants severely misconstrue the facts of *Hoffman.* The New Jersey Appellate Division's decision hinged on the fact that the non-resisting party in that case took affirmative steps to mask the forum selection clause from the resisting party. For instance, the Court describes the contract as "structured in an unfair manner so that the clause would not appear," and that the "forum selection clause was unreasonably masked from the view of the prospective purchasers." *Id.* at 212–219. In other

words, the clause in *Hoffman* was invalid for the sort of fraud or overreaching explicitly envisioned in *Phillips*. *See Phillips*, 494 F.3d at 384 (fourth step in test is determining whether "the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.") But the Defendants have pointed to nothing in this case akin to the "masking" of the forum selection clause in *Hoffman*. The undisputed facts reveal that it was BLLA's practice to offers the International Account Terms to applicants, *see* Ganz Dep. at 72:10–74:3, and moreover, the Applications very plainly informed the Defendants that their Accounts were governed by, *inter alia*, a document known as the International Account Terms.[7] *Hoffman*, therefore, only reinforces the fact that Defendant's argument is without merit. In sum, the Court concludes, again, that the forum selection clause in the Terms is presumptively enforceable.

### iv. The Forum Selection Clause is Not Gravely Inconvenient, Unreasonable, or Unfair to Defendants

██ Although the forum selection clause is presumptively enforceable, the Defendants may nonetheless demonstrate that it should not be enforced due to being either gravely inconvenient unreasonable, or unfair. The Second Circuit has explained that the presumption of validity may be overcome if "(1) [the clause's] incorporation into the agreement was the result of fraud or overreaching ...; (2) if the complaining party will for all practical purposes be deprived of his day in court, due to the grave inconvenience or unfairness of the selected forum; (3) if the fun-

damental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state." *Thyssenkrupp Materials N.A., Inc. v. M/V FEDERAL SHIMANTO*, 13–cv–1543 (CM), 2013 WL 3947749, at *2 (S.D.N.Y. July 30, 2013) (citing *Person v. Google Inc.*, 456 F.Supp.2d 488, 494 (S.D.N.Y.2006); *Roby*, 996 F.2d at 1363).

The Defendants contend that enforcement of the forum selection clause in this case would implicate the first two circumstances. The Court, again, disagrees. Defendants double (or triple) down on the theory that the clause was fraudulently foisted upon them because they allegedly never received the Terms. This is wrong as a matter of law. As already explained, Defendants had the obligation to ensure they understood a legal document they knowingly signed and which explicitly referred to the Terms. *See supra* Section III(a)(iii). Second, the Defendants argue that that they would be denied their day in court if forced to litigate in New York, as they are Uruguayan citizens and primarily interacted with BLLA employees at the bank's Montevideo office. The Court has already rejected this very argument. *See* Prior Order at 15. *See also Jalee Consulting Grp., Inc. v. XenoOne, Inc.*, 908 F.Supp.2d 387, 396 (S.D.N.Y.2012) ("Second Circuit case law is clear that mere difficulty and inconvenience is insufficient to establish the unreasonableness of enforcing a forum selection clause."); *Phillips*, 494 F.3d at 393 (the plaintiff's allegations only "suggest that litigation in [the agreed upon forum] may be more costly or difficult, but not that it is impossible"). The Defendants point to no new facts from

---

7. Indeed, far from being "masked" as in *Hoffman*, the reference to the International Account Terms on the Applications was mere

centimeters from where Defendants signed the documents. *See* Second Ancone Decl., Exs. A, B, C at 6.

discovery that alter the Court's analysis on this point.

### v. The Court Has Jurisdiction Over Defendants Regardless of the Forum Selection Clause

■ Because the Court has determined that the forum selection clause is presumptively enforceable, it need not determine whether it would otherwise have jurisdiction over the Defendants, either generally or under the forum selection clause in the Arrangements. Nonetheless, for the sake of absolute clarity, the Court highlights that it undoubtedly would have jurisdiction over Defendants in this case even if the forum selection clause were invalid.

■ "There are two types of personal jurisdiction: specific and general. Specific or conduct-linked jurisdiction ... depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation ... By contrast, general jurisdiction exists only when a [party's] contacts with a state are so continuous and systematic as to render [it] essentially at home in the forum State." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) *cert. denied*, —— U.S. ——, 134 S.Ct. 2888, 189 L.Ed.2d 837 (2014) (internal citations and quotations omitted). There is no dispute that the Court lacks *general* jurisdiction over the Defendants, who are Uruguayan citizens and have had only intermittent contact with this forum.

■ Because this is a contract dispute, the Court turns to New York law to determine whether it has specific jurisdiction over the Defendants. New York law mandates a two-part jurisdictional analysis. "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the

forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." *Aquiline Capital Partners LLC v. FinArch LLC*, 861 F.Supp.2d 378, 386 (S.D.N.Y. 2012) (quoting *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996)). The first prong of this test is governed by Section 302 of the New York Civil Practice Law and Rules ("C.P.L.R."), which delineates the state's assertion of specific jurisdiction over non-residents.

■ The Defendants are plainly amenable to service under Section 302(a)(1), which covers anyone who "transacts any business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. 302(a)(1). The Second Circuit has identified a number of factors that are relevant, but not conclusive, in determining whether a non-resident defendant has transacted business in New York under Section 302(a)(1). The factors include "(i) whether the defendant has an on-going contractual relationship with a New York corporation, (ii) whether the contract was negotiated or executed in New York, and whether after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship, (iii) what the choice-of-law clause is in any such contract, and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state." *Aquiline Capital Partners LLC*, 861 F.Supp.2d at 386–87 (quoting *Agency Rent A Car Sys. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996)).

The Defendants in this case had a near decade-long contractual relationship with BLUSA, a New York bank. *See* Second

Ancone Decl., Exs. H, I, J, K. They purchased and sold over $11 million of securities during that time through New York-based BLUSA brokerage accounts. *Id.* Although Defendants filled out the Applications in Montevideo, the Agreement itself was not executed until these documents were sent to New York. *Id.*, Ex. T at ¶¶ 11–13, 2324. Moreover, the Agreements, by reference to the Terms, contained choice-of-law provisions identifying New York law as controlling. *See* IAT at 8. Finally, each time Defendants entered into a securities transaction for their BLUSA accounts, the trades were executed in New York. Second Ancone Decl., Ex. W at 12:15–13:20, 27:11–18. This includes the trade involving the Bonds at issue in this case, which was made by a BLUSA trader at BLUSA's New York office. *Id.* at 20:3–22:25; 30:20–32:17.

These facts meet each of the first three factors elucidated in *Aquiline*. The final fact, "which concerns the sending of notices and payment into the forum state or

supervision in the forum state, is inapplicable to the facts of this case and therefore a neutral factor in deciding whether [Defendants] transacted business in New York." *Aquiline Capital Partners*, 861 F.Supp.2d at 389. Simply put, it is "well settled that the quality of a non-domiciliary's contacts with New York are sufficient to confer jurisdiction when it maintains an ongoing investment account in New York and conducts securities transactions through such an account." *Bluestone Capital Partners, L.P. v. MGR Funds Ltd.*, 98–cv–3128 (WHP), 1999 WL 322658, at *3 (S.D.N.Y. May 20, 1999).[8]

### vi. New York Is a Proper Venue

■ Defendants next assert that New York is an improper venue. To support this proposition, Defendants cite no case law and allege simply that "substantially all acts alleged in the Complaint took place in Uruguay." *See* Dkt. No. 89 at 16. Besides the fact that Defendants consented to venue in New York,[9] they are incorrect in suggesting that no significant events

8. *See, e.g., D.H. Blair & Co.*, 462 F.3d at 105 ("There are sufficient business contacts to support personal jurisdiction over the Investors under New York's long-arm statute. The Investors entered into a brokerage account agreement with Broker and executed numerous stock trades through Broker's New York offices on various New York exchanges."); *Pfizer Inc. v. Gilman*, 01–cv–8419 (DLC), 2002 WL 215653, at *3 (S.D.N.Y. Feb. 13, 2002) ("Pfizer argues that Gilman's maintenance of two brokerage accounts in New York from as early as 1997 to 2000, which he made use of either by telephone or mail to engage in twenty-two different stock options transactions on ten different days during that period, constitutes "transacting business" under Section 302(a)(1). This Court agrees."); *Gaind v. Pierot*, 04–cv–9407 (TPG), 2006 WL 846268, at *6 (S.D.N.Y. Mar. 31, 2006) *aff'd*, 282 Fed. Appx. 946 (2d Cir.2008) (transfer of millions of dollars through New York-based brokerage accounts satisfied Section 302(a)(1)); *Picard v. Elbaum*, 707 F.Supp. 144, 147 (S.D.N.Y. 1989) (finding specific jurisdiction "when a

non-domiciliary maintains an ongoing investment account in New York and especially when he directs the sale of securities in New York."); *Kulas v. Adachi*, 96–CV–6674 (MBM), 1997 WL 256957, at *7 (S.D.N.Y. May 16, 1997) (same); *Greenlight Capital, Inc. v. GreenLight (Switzerland) S.A.*, 04–CV–3136 (HB), 2005 WL 13682, at *3 (S.D.N.Y. Jan. 3, 2005) (jurisdiction where, during a six-year period, party made repeated purchases of stock traded on NASDAQ in sufficient volume to trigger SEC reporting requirements).

9. Indeed, that would be the case regardless of whether the Terms or the Arrangements applied, as both use virtually identical language on the subject. The Arrangements state that "you also consent to personal jurisdiction and venue of, any State or Federal court located in the County of New York, State of New York," *see* IFSA at 1.33, while the Terms state "you hereby consent to personal jurisdiction and venue of, any state or federal court located in New York County, New York, U.S.A." *See* IAT at 8.

relevant to the case occurred in New York. The Second Circuit has recognized that the civil venue statute, 28 U.S.C. § 1391, permits for venue in multiple jurisdictions so long as a substantial part of the events giving rise to the claim occurred in the district. *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 356 (2d Cir.2005). Accordingly, the question is not whether a substantial number of events occurred in Uruguay, or even whether a majority of the events occurred in Uruguay, but rather whether, in light of the "nature of the claims and the acts ... that the plaintiff alleges give rise" to them, "a substantial part of those acts ... occurred in the district where suit was filed." *Sea Tow Servs. Int'l, Inc. v. Pontin,* 472 F.Supp.2d 349, 363 (E.D.N.Y.2007).

The undisputed facts make clear that a substantial number of events relating to the case did in fact occur in New York: the Accounts at issue were opened in New York, the trades at issue were executed on New York exchanges by New York-based traders, and the contract in dispute identified New York law as governing the agreement. *See supra* Section III(a)(v). Accordingly, the Southern District of New York is an appropriate venue for this action.

### vii. Defendants Have Failed to Demonstrate that New York is a *Forum Non Conveniens*

■ Defendants allege that New York constitutes a *forum non conveniens.* However, again, they point to no additional facts suggesting that the Court should revisit its earlier determination of this question. The Court rejects Defendants' renewed argument on virtually identical grounds.

■ Regardless of whether or not Defendants consented to litigate in New York, they have failed to demonstrate a "sufficiently weighty concern" warranting invocation of *forum non conveniens. Armco Inc. v. N. Atl. Ins. Co.,* 68 F.Supp.2d 330, 342 (S.D.N.Y.1999). As the Court noted in the Prior Order, dismissal on the grounds of *forum non conveniens* is appropriate only "when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (quoting *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)) (alterations in original).

■ Courts within this Circuit apply a three-step process to determine, within their substantial discretion, whether dismissal is appropriate. *See Norex Petroleum Ltd. v. Access Indus., Inc.,* 416 F.3d 146, 153 (2d Cir.2005) (citing *Iragorri v. United Techs. Corp.,* 274 F.3d 65, 73–74 (2d Cir.2001)). "At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum." *Norex Petroleum,* 416 F.3d at 153 (internal citations omitted); *see also Iragorri,* 274 F.3d at 73–74.

Previously, as to the first step, the Court concluded that BLUSA's choice of forum was entitled to very strong deference for four reasons. *See* Prior Order at 18. First, the Plaintiff is a New York-based entity and brought suit in its home forum. Second, Defendants are amenable to service of process in New York by

virtue of their consent to service of process in the forum selection clause.[10] Third, the Plaintiffs chose this forum for legitimate reasons—it is BLUSA's home forum, it is the forum listed in the forum selection clause, it is the *situs* of the underlying transactions, and the contract is governed by New York law. Finally, this Court will be able to provide adequate legal assistance in resolving the matter. *See id.* at 18–19.

Defendants' argument is, in fact, exactly the same, word-for-word, as at the motion to dismiss stage. Nothing presented in either parties' Rule 56.1 statements challenges the continued veracity of the considerations above and accordingly the Court sees no need to reconsider its earlier conclusion.

The same goes for the remaining two factors. The Court continues to assume *arguendo* that Defendants' proposed alternative forum, Uruguay, would be adequate to fairly adjudicate the parties' dispute. But that is not enough in light of the fact that Defendants have failed to point to any additional facts tilting the balance of private and public interest factors in their favor. The Court previously concluded that neither the public nor private factors militated in favor of dismissal. *See id.* at 19–21. Because Defendants have made no effort to present new case law or facts suggesting that conclusion should be re-evaluated, the Court reaffirms its prior determination.

### viii. Summary

In sum, the Court reaches practically identical conclusions at this juncture regarding jurisdiction and venue as it did when it first addressed these questions in February 2013. The undisputed material facts make clear that the Defendants' Accounts were in fact governed by the Terms and that, regardless of waiver or consent, the Court possesses personal jurisdiction over the Defendants. Moreover, this forum is an appropriate venue in light of both the Defendants' consent and the undisputed facts of the case.

### b. Plaintiff's Motion for Summary Judgment

Pursuant to 28 U.S.C. § 2201(a), BLUSA seeks summary judgment on its own initial request for a declaratory judgment and further asks for summary judgment on Defendants' counterclaims. For the following reasons, BLUSA's request is GRANTED in its entirety.

### i. BLUSA's Claim for a Final Judgment Declaring It Not Liable In Tort or Contract In Connection With Defendants' Purchase of the Bonds

Courts may properly address declaratory actions through a motion for summary judgment, which are subject to the same Rule 56(a) standard as any other motion for summary judgment. *See Peter Mayer Publishers Inc. v. Shilovskaya,* 11 F.Supp.3d 421 (S.D.N.Y.2014) (citing *Middlesex Ins. Co. v. Mara,* 699 F.Supp.2d 439, 444 (D.Conn.2010)). Despite an extensive period of time in which to do so, Defendants have failed to raise any dispute of material fact regarding BLUSA's request for a declaratory judgment. That is likely because the facts of the case are as straightforward as they are undisputed. The Defendants elected to open brokerage accounts with BLUSA that were plainly non-discretionary in nature.[11] They

---

**10.** Once again, this holds true regardless of whether or not the International Account Terms or Arrangements are in effect, as they contain virtually identical clauses on the issue. *Compare* IFSA at 1.33 *with* IAT at 8.

**11.** The Terms stated that applicants agreed to the following provisions: "(1) The Bank will

signed an agreement plainly stating that BLUSA would not provide them with investment advice and would not be liable for any investment losses.[12] Defendants, on their own initiative, instructed BLUSA to execute transactions that resulted in severe losses to Defendants. The very transaction documents signed by the Defendants clearly stated BLUSA would not provide investment advice with respect to the transaction.[13] Defendants, understandably upset and dissatisfied at having received the benefit of their own bargain, sought reimbursement for their lost investments and threatened legal action in Uruguay. *See* Bittker Decl., Ex. M.

The facts above are the "hallmarks of a non-discretionary [brokerage] account." *Kirschner v. Bennett,* 648 F.Supp.2d 525, 535 (S.D.N.Y.2009). The law regarding such accounts is well-settled. As the Second Circuit summarized in *de Kwiatkowski v. Bear, Stearns & Co.:*

It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis. The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments. A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions. On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale.

306 F.3d 1293, 1302 (2d Cir.2002) (collecting cases).

In other words, "where the customer maintains a non-discretionary account, the broker's duties are quite limited" and generally only involve an obligation to obtain the customer's approval before executing a trade and to execute the trade according to the customer's wishes. *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940 (2d Cir.1998). *See also In re Lehman Bros. Inc.,* 506

be acting solely as your agent, and the Assets will be acquired, held, and disposed of at your sole risk ... (3) The decision to acquire, hold, and dispose of the Assets will be made by you following your consideration of the risks involved including (without limitation) the risks referred to in paragraph 23(f)(4), and you acknowledge that the Bank has made no representations or warranties to you related to any such risks. You further acknowledge that you are a sophisticated investor able to evaluate the merits and risks of all investments in the Assets and are able to bear the economic risk of these kinds of investments ..." IAT at Art. V, § 23(f)(1)-(3).

12. The Terms also stated that "a. Neither the Bank nor its officers or employees provide investment advice relating to the purchase or sale, pursuant to this Agreement, of foreign currencies or financial assets. Investment advice is available from the Bank only if you enter into an Investment Management Agreement with the Bank and then only in the circumstances provided for in that Investment Management Agreement." IAT at Art. V, § 25(a).

13. Defendants David and Enrique Ehrlich each signed an order form containing the following warning: "1 CONFIRM THAT REQUESTING THE BANK TO EXECUTE ON MY BEHALF AT MY SOLE RISK WITHOUT ANY RESPONSIBILITY ON THE BANK'S PART, THE FOLLOWING TRANSACTION FOR THE FINANCIAL ASSETS SELECTED BY ME AND WITHOUT THE BANK ADVISING ME IN THIS MATTER. THE FINANCIAL ASSETS ARE (1) NOT A DEPOSIT OR OTHER OBLIGATION OF OR GUARANTEED BY THE BANK AND (2) SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED." Bittker Decl., Ex. E at 1 (capitals in original), Ex. F at 1 (same).

B.R. 346, 353 n. 4 (S.D.N.Y.2014) (noting the limited duties brokers possess towards non-discretionary accounts) (citing *Press v. Chemical Investment Servs. Corp.,* 166 F.3d 529, 536–37 (2d Cir.1999)); *DeBlasio v. Merrill Lynch & Co.,* 07–CV–318 (RJS), 2009 WL 2242605, at *38 (S.D.N.Y. July 27, 2009).

 Accordingly, a broker's liability for transactions related to a non-discretionary account are limited to rare and particular sets of circumstances, such as a broker's failure to effectuate requested trades on a customer's behalf, *see In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.,* 586 F.Supp.2d 172, 193 (S.D.N.Y.2008); situations where the customer has in fact ceded control of the account to a broker, resulting in a *de facto* discretionary account, *see, e.g., In re Thomson McKinnon Sec., Inc.,* 191 B.R. 976, 985 (Bankr.S.D.N.Y.1996) ("Rather, courts will treat a technically non-discretionary account as though it were a discretionary account upon finding that a broker has seized actual control over the management of the account."); or where a "special relationship" of trust exists between the customer and broker, independently creating a fiduciary obligation on the broker's part. *See, e.g., S.E.C. v. Lee,* 720 F.Supp.2d 305, 329 (S.D.N.Y.2010). Relatedly, the Second Circuit has identified a handful of "special circumstances" where a broker must shoulder additional duties towards a non-discretionary account holder. *Ciccone v. Hersh,* 530 F.Supp.2d 574, 578–79 (S.D.N.Y.2008) *aff'd,* 320 Fed.Appx. 48 (2d Cir.2009). This is primarily circumscribed to instances where brokers possess an advantage over their clients due to their "incapacity or simplicity." *Welch v. TD Ameritrade Holding Corp.,* 07–cv–6904 (RJS), 2009 WL 2356131, at *41 (S.D.N.Y. July 27, 2009) (citing *de Kwiatkowski,* 306

F.3d at 1308–09). Namely, "special circumstances" may exist where "a client ... has impaired faculties, or ... has a closer than arms-length relationship with the broker, or ... is so lacking in sophistication that *de facto* control of the account is deemed to rest in the broker." *de Kwiatkowski,* 306 F.3d at 1308–09.

Defendants have produced no facts implicating these exceptions to the usual presumption that nondiscretionary account holders are responsible for their chosen trades. In fact, Defendants' response contains nothing at all explicitly opposing BLUSA' request for summary judgment on its requested declaratory judgment. At various points Defendants insist that disputes of material fact exist about whether BLUSA acted as their investment adviser, *see* Dkt. No. 90 at 5, particularly in light of their "decades-long" relationship with the bank. *Id.* at 7–8. But Defendants cite absolutely nothing in support of this proposition, instead merely circling back to their own Answer and Counterclaim or proclaiming their intent "to establish the precise nature of such relationship at trial." *Id.* at 7. But a pledge that they will create a dispute of material fact at a later date is far from what is needed to survive summary judgment. *See, e.g., Graham v. Kuhlmann,* 88–cv–6618 (JSM), 1990 WL 210298, at *10 n. 1 (S.D.N.Y. Dec. 12, 1990) (noting that a party "may not simply rely on their complaint" to survive summary judgment, "but must respond with specific facts showing that there is a genuine issue of material fact for trial."). Similarly, the mere allegation that BLUSA in fact controlled the Accounts does not raise a dispute fit for trial. *See, e.g., Welch,* 2009 WL 2356131, at *50 (dismissing case where complaint merely alleged broker in fact controlled non-discretionary account); *DeBlasio,* 2009 WL 2242605, at *38 (same).

In sum, BLUSA cannot be liable to Defendants for their losses associated with the Bonds. The contract governing the parties' relationship, and the order forms themselves, plainly disclaimed any obligation to advise Defendants regarding their investments and, furthermore, the undisputed facts clearly establish that BLUSA had no duty towards Defendants regarding their independent decision to invest in the Bonds. *See also Jordan v. UBS AG,* 11 A.D.3d 283, 782 N.Y.S.2d 722 (N.Y.App.Div.2004). Accordingly, BLUSA is entitled to a declaratory judgment as to the following: (1) that the Agreement, including its express limitation on BLUSA's liability, is valid and enforceable against Defendants; (2) BLUSA is not liable, as a matter of either contract or tort, under the Agreement in connection with Defendants' investment in the Bonds; and (3) BLUSA has no obligation to refund the amounts paid by Defendants to purchase the Bonds.

### ii. Defendants' Counterclaims

BLUSA also seeks summary judgment on Defendants' counterclaims of breach of fiduciary duty, a violation of the IAA, breach of contract, and negligence.

### a. Breach of Fiduciary Duty

BLUSA first argues that Defendants' breach of fiduciary duty claim is time-barred under New York's three-year statute of limitations. *See* N.Y. C.P.L.R. § 214(4). The Court need not reach this issue, however. As explained above, BLUSA had no duty, fiduciary or otherwise, to advise Defendants regarding the Bonds. Accordingly, Defendants cannot sustain this claim. *See, e.g., In re MF Global Holdings Ltd. Inv. Litig.,* 998 F.Supp.2d 157, 180 (S.D.N.Y.2014) (noting that existence of a fiduciary duty is a necessary element for breach of fiduciary duty).

### b. Investment Advisors Act

Defendants' second counterclaim similarly requires little analysis. The IAA, as its name suggests, applies only to investment advisors, which the Act defines as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b–2. But as discussed above, the undisputed facts demonstrate that the Agreement between BLUSA and the Defendants plainly disclaimed the provision of any such investment advice and Defendants have failed to present a scintilla of evidence to the contrary, instead vaguely alluding to the fact that Defendants had a long-standing relationship with Bank Leumi. *See supra* Section III(b)(i). However, because there is no dispute that the parties did *not* enter into a contract for investment advisory services, Defendants claim under the IAA fails as a matter of law. *See DeBlasio,* 2009 WL 2242605, at *16 (citing *Kassover v. UBS AG,* 619 F.Supp.2d 28, 31–32 (S.D.N.Y.2008)).

### c. Breach of Contract and Negligence

Defendants' final two counterclaims, for breach of contract and negligence, can most charitably be characterized as peculiar. For a start, the facts underlying these claims are wholly unrelated to any other aspect of the case. Additionally, the facts underlying these claims are not facts. In their amended counterclaim, Defendants allege that, through its complaint and filings, BLUSA "improperly disclose[d] Defendants' confidential banking information in numerous places," including information related to the Defendants' Uruguay identification documents, their

fingerprints, and the Uruguayan-equivalent of a social security number. AAC ¶ 143. The Defendants allege that these disclosures violated both American and Uruguayan law, and the terms of the parties' Agreement. *Id.*

There are several severe problems with Defendants' arguments.[14] First, they allege that BLUSA initially disclosed this confidential information on August 15, 2012 by appending it to Donald Bittker's declaration in opposition to Defendants' motion to dismiss. *See* Dkt. No. 17. The problem, however, with this theory of wrongful disclosure, is that Defendants had in fact disclosed the *exact same information* several weeks earlier in support of that same motion to dismiss. *See* Dkt. No. 10. Accordingly, Defendants, having already put the ostensibly sensitive information on the public record themselves, cannot sustain a claim for breach of contract, which requires damages stemming from the breach,[15] or a claim of negligence, which requires demonstrating causation between the alleged negligence and damages suffered.[16]

▮▮▮▮ Second, and more importantly, the Court plainly lacks subject matter jurisdiction over these claims. Both breach of contract and negligence are common law claims arising under New York, rather than federal, law. Moreover, Defendants do not allege an amount in controversy sufficient to provide diversity jurisdiction under 28 U.S.C. § 1332. Accordingly, if subject matter jurisdiction is to exist, it must be pursuant to supplemental jurisdiction under 28 U.S.C. § 1367(a), which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The Second Circuit has concluded that claims are part of the same case or controversy when they are "derive[d] from a common nucleus of operative fact." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 335 (2d Cir.2006). Because the district court is "well-placed to consider the issues that would arise" should supplemental jurisdiction be granted, it is afforded considerable discretion in determining when to exercise such jurisdiction. *Id.*

The facts relating to Defendants' claims for breach of contract and negligence plainly do not derive from the same common nucleus of operative fact as their other claims, which concern the contract signed by the parties in 2002 and the fallout from Defendants' purchase of the Bonds in 2007. Conversely, the supplemental claims concern BLUSA's conduct in the ongoing litigation itself and bear no relation to the liability of the parties for the purchase of the Bonds. Accordingly, the Court concludes it lacks subject matter jurisdiction over Defendants' final two

---

**14.** Defendants seem to be acutely aware of this, as they make no mention of these claims in any of their legal briefs. This is another factor weighing in favor of declining supplemental jurisdiction, as discussed below. *See Rosario v. Int'l Auto Mall & Leasing Ctr., Inc.,* 12–cv–4059 (ALC), 2013 WL 1144893, at *3 (S.D.N.Y. Mar. 19, 2013) (declining supplemental jurisdiction where counterclaims "garnered so little attention from its moving party").

**15.** *See, e.g., Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,* 837 F.Supp.2d 162, 189 (S.D.N.Y.2011) (citing *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996)).

**16.** *See, e.g., Pasternack v. Lab. Corp. of Am.,* 892 F.Supp.2d 540, 552 (S.D.N.Y.2012).

counterclaims. *See Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir.2000) ("alleged dissemination of confidential information" during a hearing related to litigation was not a pendent claim to underlying federal cause of action).

## IV. CONCLUSION

In conclusion, BLUSA's motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED. This resolves Dkt. Nos. 82 and 88. The Clerk of Court is instructed to terminate the case.

SO ORDERED.